## PEONAGE CASES.

### (District Court, M. D. Alabama.   June 16, 1903.)

1. PEONAGE—CONSTRUCTION OF STATUTE PROHIBITING—OFFENSES.

Under Rev. St. § 5526 [U. S. Comp. St. 1901, p. 3715], which makes it an offense to hold, arrest, or return, or to cause or aid in the arrest or return of, any person "to a condition of peonage," it is immaterial to such offense whether or not the condition of peonage exists by virtue of a local law or custom creating a system of peonage, or whether it exists in violation, or without the sanction, of law.

2. PENAL STATUTES—RULES OF CONSTRUCTION—PENALTY AGAINST INVASION OF PERSONAL RIGHTS.

Statutes imposing penalties for the invasion of the rights of the citizen in order to protect him in his liberty and happiness are not subjects of disfavor in the law, and are not construed with the same strictness or on the same footing as those which regulate or restrain the exercise of a natural right or forbid the doing of things not intrinsically wrong.

3. PEONAGE—WHAT CONSTITUTES "CONDITION OF PEONAGE."

The "condition of peonage," to hold or return a person to which is made a criminal offense by Rev. St. § 5526 [U. S. Comp. St. 1901, p. 3715], is a condition of enforced servitude by which the servitor is restrained of his liberty and compelled to labor in liquidation of some debt or obligation, either real or pretended, against his will; and any agreement giving another the right to exact such servitude is invalid under the law, and treated as though made involuntarily, and affords the creditor or master no protection.

4. SAME.

What influence, force, or threats to compel a person to render service to another in liquidation of an obligation amounts to coercion, such as, if effective, will render the service involuntary and create a condition of peonage, must be determined by taking into consideration in each case the relative inferiority of the person contracting to perform the service to the person exercising the force or influence to compel its performance.

5. SAME—OFFENSE OF HOLDING TO CONDITION OF PEONAGE.

A person who hires another or induces him to sign a contract by which he agrees during the term to be imprisoned or kept under guard, and under cover of such agreement afterward holds the party to the performance of the contract by threats or punishment or undue influence, subduing his free will, when he desires to abandon the service, is guilty of holding such person to "a condition of peonage."

6. SAME.

A person who falsely pretends to another that he is accused of crime, and offers his good offices to prevent his conviction if he will pay a sum of money, thereby to satisfy the prosecutor, and thus induces such party to sign a contract obligating himself to work to reimburse the amount paid out or pretended to be paid out for this purpose, and to submit to restraint and deprivation of his liberty while he is performing the contract, is guilty of holding such person, or causing him to be held, to a condition of peonage, whenever such person, having so entered on performance of the contract, desires to leave it, but is compelled to re-

main and perform it by threats or punishment, subduing his freedom of will; and any third person for whose benefit such a contract is made, who, knowing such facts, becomes the custodian of the person so held to servitude and enforces performance of the contract, is also guilty of the offense.

**7. SAME.**

If one person carries another before a magistrate, informing him that he is accused of crime, and the magistrate induces the accused, who is of weak mind, or little intelligence, or confiding, to believe that he has been sentenced to hard labor for a fine, when in fact no offense was charged, no warrant issued, and no judgment entered, and such person is induced by such fraudulent means to submit to restraint of his liberty, the persons so concerned are guilty of causing the accused to be held to a condition of peonage.

**8. KIDNAPPING—FALSE ACCUSATIONS OF CRIME.**

Any person who falsely accuses another of crime, and carries him before a magistrate in order that he may be convicted and put to hard labor, having at the time the purpose or design to hire such person or to enable some other person to hire him, is guilty, under Rev. St. § 5525 [U. S. Comp. St. 1901, p. 3715], of "carrying away any other person with intent that such other person be sold into involuntary servitude."

**9. CONSPIRACY AGAINST EXERCISE OF CIVIL RIGHTS.**

If two or more persons conspire to effect such purpose by false accusations, they are guilty, under Rev. St. § 5508 [U. S. Comp. St. 1901, p. 3712], if such accused person is a citizen of the United States, of a conspiracy to deprive him of the free exercise or enjoyment of a right or privilege secured to him by the Constitution of the United States.

**10. PEONAGE—RESTRAINING CONVICT AFTER EXPIRATION OF TERM.**

Under the statute of Alabama which permits a person convicted of crime to sign a contract in open court, with the written approval of the judge, by which he submits himself to servitude to his surety, on confession of judgment by the latter for the fine and costs, until such fine and costs have been reimbursed by his labor, the provisions of the statute must be strictly followed, and the contract cannot be extended beyond the payment of the fine and costs, nor can it be transferred without the consent of the convict. If he is held thereunder against his will and by force or threats after the fine and costs have been paid, or by another to whom the contract has been transferred without his consent, the person so retraining him is guilty of holding him to a condition of peonage.

**11. SAME—ACTS OF JUDICIAL OFFICER.**

A magistrate or other judicial officer is not criminally liable for an error of judgment or for any act honestly performed under an unconstitutional law, but where he corruptly exercises his functions in order that a citizen may be convicted unlawfully, and sentenced, so that a particular person with whom he has an understanding, express or implied, by becoming surety on a confession of judgment may get the custody of the convict or make a profit out of a contract to be made between the convict and his surety, in consequence of which the convict is restrained of his liberty and put to hard labor, such magistrate cannot escape criminal liability to the United States for the conspiracy, and its natural and designed results in the holding of a citizen to a condition of peonage, because of the official character of his acts.

**12. STATUTES—CONSTITUTIONALITY—IMPOSING IMPRISONMENT FOR DEBT.**

Act Ala. March 1, 1901 (Acts 1900–01, p. 1208, § 1), makes it a penal offense where any person who has contracted in writing to labor for or serve another for any given time, or who has by written contract leased or rented land from another for any specified time, or who has contracted in writing with the party furnishing lands, or the lands and teams to cultivate it, either to furnish the labor or labor and teams to cultivate the lands, shall afterwards, without the consent of the other party and without sufficient excuse, to be adjudged by the court, "leave such other

party or abandon said contract or leave or abandon the leased premises or land and take employment of a similar nature from another person without first giving him notice of the prior contract." Another statute subjects the new employer to heavy penalties if he employs such person, with knowledge of the prior contract, without the consent of the former employer. *Held*, that such statute, which imposes a criminal liability and subjects a person to imprisonment for the mere breach of a private contract if he exercises his legal right to enter into another contract, is invalid as in violation of the provision of the state Constitution prohibiting imprisonment for debt, its clear purpose and effect being to coerce the payment of a purely civil liability, arising from breach of contract, by means of criminal proceedings.

13. SAME—CLASS LEGISLATION.
    Such statute is also unconstitutional as class legislation, subjecting laborers and renters to penalties, for breach of contract, which are not imposed on any other class of citizens.

14. CONSTITUTIONAL LAW—DENIAL OF EQUAL PROTECTION OF LAWS—STATUTE ESTABLISHING SYSTEM OF PEONAGE.
    Such act is also void, as in violation of the Constitution of the United States, in denying to the classes of citizens affected the equal protection of the laws, and of the thirteenth amendment, prohibiting involuntary servitude except as a punishment for crime, and its enforcement establishes a system of peonage within the meaning of Rev. St. § 1990 [U. S. Comp. St. 1901, p. 1266], enacted to carry such amendment into effect.

Response to Questions Propounded by Grand Jury Relative to Peonage and Involuntary Servitude.

JONES, District Judge. Pressure of other official duties has prevented earlier response to your requests for the advice and opinion of the court. The importance of the questions raised induces written answer at length. For some time you have been inquiring as to alleged violations of the statutes against peonage and involuntary servitude. Breaches of these laws involve the peace, good order, and honor alike of the state and of the United States. They are matters of gravest concern to every citizen. While it is a source of much regret that these laws have been violated in two localities, involving about a score of offenders, yet it must nevertheless be a pleasing reflection that the abhorrence of our people for such offenses, and the sustaining power of a just public opinion in this state, will lighten your labors in the effort to probe this evil to the core.

### What Peonage Is.

What is meant by the phrase, holding or returning a person to "a condition of peonage," as used in the Revised Statutes? At the time of the passage of the act of Congress to which your attention will presently be called, a system of service popularly called "peonage" existed in New Mexico, though not so termed in the laws of the territory, which spoke of the relation as that of master and servant. It derived the institution from Mexico, which, in turn, inherited it from Spain. Peonage was not slavery, as it formerly existed in this country. The peon was not a slave. He was a freeman, with political as well as civil rights. He entered into the relation from choice, for a definite period, as the result of mutual contract. The relation was not confined to any race. The child of a peon did not become a peon, and the father could not contract away the services

123 F.—43

of his minor child, except in rare cases. The peon, male or female, agreed with the master upon the nature of the service, the length of its duration, and compensation. The peon then became bound to the master "for an indebtedness founded upon an advancement in consideration of service." In the earlier stages of the institution there, the person agreeing to perform service could put an end to the relation by paying whatever he owed to the employer, at any time. If the peon wished to change masters or service, he could find a new employer who would advance enough to pay the peon's debts to his then master, and the peon would then become bound in the new employer's service. So also the master could sell the services of the peon, for the term, to any one who would pay his debts and assume the duties and obligations of the master. Under later laws, the party could not abandon the contract, except by mutual consent or "by some sufficient motive given by one party to another, such as having grievously injured him, or where the master kept the accounts in an ambiguous manner, so that the servant could not understand them." In these cases the contract could be rescinded by paying the amount due by one party to the other. If no such motive "should be proven, the contract must be complied with, and the judge or court would order it carried into effect by imposing upon the party failing to comply with the contract, and who shall persevere in doing so, that he should indemnify the other party for the injury resulting therefrom; and all resistance was punished by a fine or imprisonment, as the gravity of the circumstances and resistance may require." If the servant refused to comply, and owed any money to the master, and he refused and could not pay it, the court would compel him to pay the principal and interest to the other, and might order the sheriff to contract the services of the peon to the highest bidder. The same proceedings could be had against the master if he failed to pay what he owed. "It seems clear," as declared by the highest court of the territory, in reviewing the legislation on the subject, "that the legislators were determined that by no means should either of the parties escape the consequences of their own voluntary agreement." The agreement once made, the employé, or person for whom an advance was made, except in the cases stated, became irrevocably bound to service.

The powers of justices of the peace, who succeeded to most of the jurisdiction of the alcaldes in the administration of the law, were not clearly defined, and left very much to their discretion as to the return of persons to service, and the mode and quantum of judicial power which could be exercised to compel the service. There was often "unscrupulous disregard" as to "the legal rights of the unfortunate, the peon, and the feeble, when contesting with the wealthy and influential." The improvidence and the needs of laborers and servants, the greed of employers, and the exercise, often corrupt, of almost irresponsible power of local magistrates, resulted in citizens becoming bound, in constantly increasing numbers and length of service, to compulsory "service or labor" to coerce payment of debt or compel the performance of real or pretended obligations of personal service. The evils of the system not only degraded those

who were subjected to the system, but exercised a baleful influence upon all other classes, which in innumerable ways fought against the industrial prosperity and moral advancement of the people among whom the "system" was enforced. It was also wholly out of keeping with the spirit of the amendment to the Constitution, which forbids involuntary servitude, except upon due conviction of crime.

The courts of the territory, after the passage of the thirteenth amendment, holding that it destroyed the right formerly existing under the territorial laws to hold to service, released peons from compulsory service on writs of habeas corpus, wherever applied to, but made little headway against the evil. Peons had become so degraded that in many instances they voluntarily returned to the compulsory service, being content to give control over their persons and freedom to masters who, in return, would feed and clothe them and their families. Masters, in many instances, resented the new order of things, "which deprived them of proper control of their labor," and exercised their old authority in spite of the new amendment, which was not then enforceable by criminal penalty. Officers of the army, particularly in the case of Indians, used the forces of the United States to hold or return them to the system of compulsory labor or service, in discharge of their contracts, debts, or obligations.

Congress, therefore, determined not only to destroy the system as it existed in New Mexico, but to prevent in the future in that territory, or "in any other territory or state" of the Union, the reappearance or re-establishment of the evil conditions which the system created. Accordingly, by the act approved on the 2d day of March, 1867, now embraced in sections 1990 and 5526 of the Revised Statutes of the United States [U. S. Comp. St. 1901, pp. 1266, 3715], it was enacted:

"Sec. 1990. The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in the territory of New Mexico, or in any other territory or state of the United States; and all acts, laws, resolutions, orders, regulations, or usages of the territory of New Mexico, or in any other territory or state, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void."

"Sec. 5526. Every person who holds, arrests, returns, or causes to be held, arrested or returned, or in any manner aids in the arrest, or return of any person to a condition of peonage, shall be punished by a fine of not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one year nor more than five years, or both."

The meaning of the terms in this statute must be sought in the light of this history of the institution in New Mexico, and the design of Congress interpreted in the light of the evil "condition" that system developed, which the statute declared should not thereafter exist in any state or territory.

## Holding to the Condition of Peonage, Howsoever Accomplished, Prohibited and Punished.

The right, privilege, or immunity of a citizen of the United States to be free from slavery or involuntary servitude of any kind, except

upon due conviction of crime, being given or secured by the Constitution of the United States to every citizen of the United States, Congress, under the authority vested in it by the thirteenth amendment, had power not only to strike down and annul laws which supported the system of peonage in New Mexico, but, by direct and primary legislation of its own, to punish criminally individuals who, in any part of the United States, violate the rights of citizens of the United States in this regard, by lawlessly subjecting them to the results and evils, "the condition," of the forbidden system. Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060. Congress, by the act cited, not only annulled all legislation attempting to uphold peonage as a legalized institution, but went further and provided for the punishment of every person instrumental in holding, arresting, or returning "of any person" to a "condition of peonage." The language of this second section is plain, emphatic, without ambiguity, and makes no exception whatever. "Every person" who holds "any person" to "a condition of peonage" is declared an offender against the laws of the United States. If there be "a condition of peonage," "every person" who holds another to it violates the plain command of the statute. The statute nowhere makes it an element or constituent of the offense of "holding to a condition of peonage" that the condition shall exist or be created under any law or custom upholding a "system" of peonage. The act of Congress, in its different sections, clearly distinguishes between the "system" and the "condition." The real vice of the "system" was the "condition" it brought about. The evil was the same, whether brought about by law or by lawlessness.

Granting that the act of Congress is penal, and must be strictly construed, it is enough to say that strict construction never authorizes a court to restrain the plain words of a statute so as to except or exclude from its operation cases which fall within its letter and spirit. It is elementary law that the "strict rule of interpretation is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular, instead of the narrower technical one; but the words should be taken in such sense, bent neither the one way nor the other, as will best manifest the legislative intent." The strict rule of construction cannot be carried so far as to "permit that the statute be eluded or its purposes defeated." We must consider what the law was before, which, Lord Coke says, is "the very lock and key to set open the windows of the statute"; also "the mischief against which the law did not provide, and the true reason for the remedy." The law delights in the liberty and happiness of the citizen. Penalties denounced against those who invade these rights, in order to protect that liberty and happiness, are not subjects of disfavor in the law. They are never construed with the same strictness, or on the same footing, with penalties which regulate or restrain the exercise of natural right, or forbid the doing of things not intrinsically wrong. No man has any natural right to keep another in involuntary servitude.

The federal statutes, before the passage of this act of Congress, did not provide against either the mischief of the "system" of peonage or "the condition" it brought about. They did not annul exercises of authority by states and territories to institute the system, and did not punish individuals who reduced others to the "condition" of peonage. The act of Congress, intending to remedy the existing mischief, by its first and second sections struck, at one and the same time, both at the authority to uphold the "system" by law or usage, and at the holding or returning to a "condition" of peonage, brought about by the acts of individuals, whether with or without the sanction of state or territorial laws or customs. Holding to "a condition of peonage" is as destructive of the rights and liberties of the victim of the condition, and as productive of public ill when brought about by lawless force on the part of individuals, as when upheld by state or territorial law or custom. The evil called for a remedy in both cases, and Congress gave it in both cases. In view of the direct and plain words of the statute, and the evils which induced its passage, the court would usurp the province of the lawmakers, and bodily amend the statute, by holding that Congress intended to punish individuals who bring about the holding or returning to "condition of peonage" in some states and territories, and yet not to deal with them if they did the same acts in other states and territories. It would be trifling with the letter and spirit of a statute intended to protect a great fundamental right of the citizen, not only "in the territory of New Mexico," but "in any other state or territory," to hold that the penalties which Congress denounces against individual acts of "every person" who returns "any person" to "a condition of peonage" were intended to prevent individual invasion of the rights of person and liberty of citizens of the United States, only in case the local power lent the pretended sanction of law to the enormity of the individual lawlessness, to uphold that which Congress denied, alike to states and individuals, the right to do or effect anywhere in the United States. Congress did not stop at corrective legislation, and content itself merely with nullifying state or territorial laws or customs which attempted to "create, maintain, or establish" the evil "system." It denounced in the second section of the act—which was intended to effectuate the policy declared in the first section—penalties upon individual acts, in order to prevent individuals bringing about anywhere the holding or returning to the "condition" which had been upheld, or might thereafter be attempted to be upheld, under the authority of state or territorial "system," in "the territory of New Mexico, or in any other state or territory." Congress having stricken down, by this statute, systems of peonage, which, prior to the adoption of the thirteenth amendment, it was in the power of states or territories to put in force, and having forbidden any like exercise of authority in the future, cannot reasonably be supposed to have contemplated that reducing persons to "a condition of peonage" would thereafter be attempted by legislation of any state or territory, though, out of abundant caution, it legislated against even that remote contingency. The presumption is not and ought not to be indulged, in advance, that a state or territory will

attempt to nullify the provisions of any constitutional act of Congress. The presumption is the other way until dispelled by acts to the contrary. It is clear, therefore, that Congress contemplated that individual acts, unsupported by laws which states or territories were forbidden to pass, would be one, and the main, if not the only, agency for bringing about holding or returning to the forbidden condition. Congress struck at these individual acts, the chief instrumentalities by which it contemplated the evil could or would be continued, and declared that "every person" who returned or held "any person" to a "condition of peonage"—regardless of the question whether that "condition" was denounced or upheld by the laws of the state or territory—was guilty of a crime against the laws of the United States. The fact that this act of Congress is corrective merely, so far as it relates to the legislation of states or territories, cannot blot out or suspend the operative effect of the further commands it addresses, in other parts of the statute, to individuals, or the penalties it imposes upon them for the violation of those commands, in bringing about the holding or returning to "a condition of peonage." When Congress, in the exercise of power granted by the Constitution, declares certain acts criminal offenses against the United States, no state or territorial law or custom, or the absence of them, can purge the offense of its criminality, or suspend, or control, or effect, the right of the United States to punish that offense. Remembering that Congress not only explicitly struck down state or territorial laws which upheld the system, and forbade and annulled any future attempt by any state or territory to renew the system, but went further, in order to make its policy more effective, and imposed punishment upon individuals, the conclusion is irresistible, that Congress never intended that the penalties denounced against individual acts should depend for their operation or enforcement in any way upon anything a state or territory might or might not do, or the maintenance of any custom looking to a revival of the "system" which the state or territory or locality was forbidden to attempt. The good custom and habit of a locality, territory, or state not to violate, or attempt to nullify, a provision of an act of Congress, cannot be pleaded to shield an offender against that law, because his acts are an exception to the prevailing rule or custom of obedience to law in that state or territory. Congress never intended, when it denounced the holding to "a condition of peonage" of "any person" by "every person," that this law for the protection of liberties of citizens of the United States should be partial or local in its operation, or that individuals might violate this general statute of freedom with impunity, unless the state or territory in which the offense occurred attempted to do something it had no power to do, or the offense was of such frequent occurrence, and committed by so many persons there, as to amount to a custom to violate the act of Congress. It is a new doctrine in jurisprudence that the good behavior of an offender's neighbors, or the observance by the state of valid laws passed, in pursuance of the Constitution of the United States, to punish an offense, is to be taken into account in determining whether there has been a violation of a penal enactment which is leveled at mis-

deeds of individuals as well as the misuse of authority by states and territories.

### Definition of Holding or Returning to a Condition of Peonage.

What is meant by a "condition of peonage," or holding or returning thereto, is easily gathered from the words of the statute, and the working of the system in New Mexico when upheld there as a legal institution. Under the abolished system, as we have seen, the citizen could sell his own services, and could contract with another for the exercise of dominion thereafter over his person and liberty, so that he could be held or subjected, against his will, to the performance of his "obligation." He could also sell or transfer his interest in the performance of personal service due, or claimed to be due, him from other persons, and thus cause them to be held in subjection, by dominion exercised over person and liberty, to coerce them to the performance of contracts and obligations. Citizens and foreigners alike, under the forbidden system, had power to put themselves or others in a situation—a "condition"—where they could be put upon the block, and dominion over their persons and liberties sold, for the term, to the highest bidder, to compel performance of private obligations. Advances to the peon to release the claim of some other person upon his labor or services, in order to acquire power to exact compulsory labor or service for the person making the loan or advance, were common practices. Indeed, these loans or advances, whether to the peon or some other person for him, or to release the claim of some other upon his labor and acquire it for the lender or advancer, constituted the chief "obligation" upon which the right of compulsory service or labor was founded. This state of things constituted the "condition of peonage" which the statute, save in the case of persons hereafter noted, designed to destroy and tear up, root and branch; annihilating, not merely the "system," but also the status—"the condition"—together with all the inevitable incidents to which it led or permitted. The condition of peonage to which it is forbidden to hold or return any person is plainly disclosed in the latter part of section 1990, where it speaks of "voluntary or involuntary service or labor of any persons, as peons, in liquidation of any debt or obligation, or otherwise." What the service or labor of any persons as "peons" was, we have already seen. It was the exercise of dominion over their persons and liberties by the master, or employer, or creditor, to compel the discharge of the obligation, by service or labor, against the will of the person performing the service. The condition of peonage, therefore, to which it is forbidden to hold or return any person, by the express words of the statute, means the situation or status in which a person is placed, including the physical and moral results of returning or holding such person to perform labor or service, by force either of law or custom, or by force of lawless acts of individuals unsupported by local law, "in liquidation of any debt, obligation, or otherwise." The phrase "condition of peonage" means the actual status, physical and moral, with the inevitable incidents to which the employé, servant, or debtor was reduced under that system, when held to involuntary performance

or liquidation of his obligation—the effect thereby produced upon the person, liberties, and rights of a man held in such a situation. "Otherwise," in contradistinction to "any debt or obligation," cannot mean less than that the debt or obligation upon which the claim to compulsory service is based need not be real or of legal validity, but includes cases when the "obligation," performance of which is coerced by labor against the will of the servitor, is unfounded, concocted, or illegal, or arises from agreements or dealings with strangers claiming the right to his service; as where a person having or pretending to have some obligation of the servitor transfers the obligation, upon which he claims the right to exact service, to a third person, who coerces labor or service against the will of the debtor or person claimed to be bound by the obligation, in settlement or "liquidation" of such "obligation," or "otherwise"; that is, by like means.

The first step to create a condition of peonage is taken when the debtor or person agreeing to perform "service or labor" contracts that it may thereafter be coerced, against his will, by dominion over his person and liberty; or where a third person, who has no contract or agreement or obligation of the debtor, agrees with some other person who is or pretends to be a creditor, or to have the right to exact personal service, to buy the claim or obligation, with the purpose or view to coerce performance of the service or payment of the debt, or "obligations," by holding the debtor, against his will, until he performs it. Under the statute a person may neither agree nor volunteer to be held to a condition of peonage, or to be coerced into subjection to such a condition. In the legal sense, whatever they may be in other aspects, such agreements are involuntary in their inception, since the law forbids consent, and therefore treats the agreement as having been made involuntarily—against the will. Such agreements are illegal under the peonage statute, no matter how made; but the making of the forbidden agreement to hold or be held to "a condition of peonage," if nothing more is done, cannot be punished under the statute, though the agreement itself may amount to a violation of the conspiracy laws of the United States. The holding or returning to a condition of peonage arises and exists whenever unlawful dominion is exercised over the person and freedom of one, whether he has agreed or not to submit to such control, in order to exact compulsory performance of labor or service against his will; or when, without the agreement, such dominion is used and exercised over him at any time upon a claim of indebtedness or obligation due or claimed to be due from him, directly or indirectly, whether well or ill founded, in consequence of which the service is compulsorily exacted of him against his will. The statute, though it goes further, has in view kindred purposes with the provision of our state Constitution against imprisonment for debt. If the agreement, under the sweeping provisions of the statute, can ever be said to be voluntary, it certainly becomes involuntary the moment the person desires to withdraw, and then is coerced to remain and perform service against his will.

The penalties of the statute strike at any designed and deliberate course of action on the part of the creditor, or hirer, or employer, or other person claiming the right to exact service of another, to compel the debtor or person contracting to render the service, or of whom it is claimed, to submit against his will at any time to dominion over his person and liberty, if, in consequence of such acts, the person, against his will, is compelled to render personal service to liquidate a debt or "obligation." Deprivation of liberty, or imprisonment, or force, to accomplish some other purpose, distinct from the enforcement of a debt, obligation, or contract of service, or claim of right to exact it, will not bring the offending party within the reason of the statute. Such acts done with other motive than to compel' service may amount to assault and battery, or to false imprisonment, or to other violation of the criminal or civil laws of the state; but they dó not constitute the holding or returning to "a condition of peonage," within the meaning of the statute. The test often given for determining the influence, force, or threats which deprive a person of freedom of choice, and coerce his will, is that the force, influence, or threats must be sufficient to overcome the will of a reasonably firm man under like circumstances; but the better rule, which should be applied to these cases, is that, as all persons are not of like courage and firmness, the court or jury, as the case may be, must consider the situation of the parties, the relative inferiority or inequality between the persons contracting to perform the service and the person exercising the force or influence to compel its performance, and determine, in view of all the circumstances, whether the service was involuntary—upon compulsion. It will not do in all cases to say that the party should have relied upon the law for redress, and resisted the force or threats by legal proceedings, instead of submitting to the wrong; since the protection of the law, in many cases, may not be sufficiently immediate to prevent the threatened injury, nor afford anything like sufficient and adequate compensation for the injury which would result if the force and influence were then resisted.

There are many persons, other than those duly convicted of crime, who may be compelled against their will to perform "labor or service." The holding of such persons "to service or labor" against their will does not fall within the reason of the peonage statute, and you will not concern yourselves about them in your investigations. Instances where such compulsory service may be enforced arise in the case of parent and child, master and apprentice, as to certain services to be rendered the government, as in the army and navy, and also where the state exacts public duties of the citizen, such as service in the militia, working of the public roads, and the like. The institutions and customs of all countries, whether despotic, constitutional monarchy, or republic, have always regarded such service as the discharge of honorable public duties, which every patriotic citizen or subject owes to his government, and held that compulsory performance of them does not invade the liberties of freemen, or reduce them to "involuntary servitude," as understood and designed to be prevented by the Constitution. The law also permits the exaction of involun-

tary service in cases of sailors in the merchant marine who have signed a contract to perform the voyage, etc.

Coming now to more specific answer to your questions, the court gives you the law as follows:

1. A person who hires another, and induces him to sign a contract by which he agrees during the term to be imprisoned or kept under guard, and under cover of such agreement afterwards holds the party to the performance of the contract by threats or punishment, or undue influence, subduing his free will, when he desires to abandon the service, is guilty of holding such a person to "a condition of peonage."

2. A person who falsely pretends to another that he is accused of crime, and offers his good offices to prevent his conviction, if he will pay a sum of money, thereby to satisfy the prosecutor, and thus induces such party to sign a contract obligating himself to work to reimburse the amount paid out or pretended to be paid out for this purpose, or to pay any other sum on this account whereby such person agrees to serve him or labor for him, and to submit to restraint and deprivation of liberty while he is performing the contract, is guilty of causing such person to be held, or of holding him, in a condition of peonage, whenever such person, believing that the service is necessary to avoid conviction, enters upon the performance of the contract, and is then compelled to remain and perform it—though he desires to leave it—by threats or punishment, subduing his freedom of will. The person who makes such a contract with the person held to service, that another may get the benefit of his enforced labor, and the person who becomes his custodian, knowing the fact, and enforces the performance of the contract, if the deceived person is compelled to labor against his will, is guilty under the statute.

3. If one person carries another before a magistrate, informing him that he is accused of crime, and the magistrate induces the accused, being of weak mind, or of little intelligence, or confiding, to believe that he is being prosecuted in the court, and that he has been sentenced to hard labor for a fine, and that the party bringing him before the court has confessed judgment for the fine, in consequence of which the person believing himself lawfully sentenced to hard labor for the fine submits to restraint, and his will is subdued by reason of the fraud and the official character of the person before whom he is brought, because he believes himself to be a convict and restrained by the power which the law gives to a hirer over convicts, and he enters upon the service and works under the contract against his will, the persons so concerned are guilty of causing the accused to be held in a condition of peonage, though no warrant issued, no offense in fact was charged, no judgment was rendered, and the person who carried him before the magistrate was only a private citizen.

4. Any person who falsely accuses another of crime and carries him before a magistrate in order that he may be convicted and put to hard labor, in consequence of which such person is convicted and put to hard labor, the false accuser at the time having the purpose or design to hire such person, or to enable some other person to hire him, is guilty, under section 5525 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3715], "of carrying away any person,

with the intent that such other person be sold into involuntary servitude." If two or more persons conspire or combine to do this, they are guilty of a conspiracy to deprive the person, if he is a citizen of the United States, of the free exercise or enjoyment of a right or privilege secured to him by the Constitution of the United States, and are indictable accordingly.

5. If a defendant, convicted of a misdemeanor, signs in open court a written contract, approved in writing by the judge, in consideration of another becoming his surety on confession of judgment for the fine and costs, and is thereupon released, the law of the state treats him as a convict who has resigned himself to the custody of his surety to escape that of the state, and the surety may restrain him of his liberty, and invoke the aid of the state law to compel the service. This provision applies only to cases in which there has been a lawful conviction, and a written contract, signed in open court, approved in writing by the judge. The contract cannot extend beyond securing the fine and costs while they are being worked out. It cannot be made, as has been repeatedly declared by the Supreme Court of this state, the basis of a contract for additional service on payment of advances, and the convicted person cannot be held in involuntary servitude for their payment.

6. Although one may have confessed judgment for another on his conviction, the surety is not entitled on that account to detain him in custody against his will, as his bail would be before trial, unless the surety has complied with the statutes of the state, and made written contract in open court, approved by the judge in writing. This is a safeguard which the state exacts to prevent abuse and oppression when the surety intends to hold his principal to involuntary service to reimburse him for the payment of the fine and costs. As such an agreement involves personal trust and confidence on the part of the convict in the selection of a keeper, his surety has no authority, without his consent, to transfer the contract and custody of the convict to some other person, who repays to the surety the fine and costs, and enforces the performance of the service. If there is no written contract approved by the court, or if it is transferred without the consent of the convict, the convict cannot be held against his will to perform service to repay his fine and costs. If one holds another convicted of a misdemeanor, against his will, because he has confessed judgment for the fine and costs, without obtaining a written contract in open court, approved in writing by the judge, or holds him against his will, after the fine and costs have been worked out, for advances upon a further term of service, or prevents his leaving by force or threats as above defined, such person is guilty of holding the person in a condition of peonage.

### Judicial Officers not Responsible for Mistakes and Errors.

7. The magistrate or other judicial officer who makes an error of judgment in the exercise of his jurisdiction—exceeds his authority in the sentence imposed—is not guilty of the offense of causing the party to be held in a condition of peonage, or in involuntary servitude, because in consequence of such sentence the defendant is put and kept

at hard labor. There must be much more than that to involve the officer in criminal responsibility. For reasons of imperative public policy, a judicial officer is not responsible, civilly, for mistakes or errors of judgment; nor is he indictable or impeachable for such. The statutes against peonage and involuntary servitude are not intended to punish officers where persons are convicted or sentenced under unconstitutional laws, or through errors or mistakes in the administration of constitutional laws, and are held, under sentence thereon, to labor by state officers, or hired, according to the requirements of law, to others, who restrain the convict and compel him to perform labor against his will. Imprisonment under an unconstitutional law is of course unlawful, and civil responsibilities may attach, under certain conditions, to other than judicial officers; but a person who does no more than to bring the machinery of the law into play from proper motives, or sits in judgment, or executes the sentence, is not criminally responsible, under the statutes, for holding or causing the party to be held to "a condition of peonage" or involuntary servitude. The wisest and best men differ as to the constitutionality of laws, and the highest courts frequently overrule or depart from their own decisions, and constantly reverse the judgments of lower courts. There would be little independence or safety on the part of those who expound or execute the laws, if criminal responsibilities attached to honest errors or mistakes of judgment.

### Liable for Intentional Wrong.

8. On the other hand, where a magistrate or other judicial officer corruptly exercises his functions in order that a citizen may be convicted unlawfully and sentenced, so that a particular person, with whom he has an understanding, express or implied, by becoming the surety on confession of judgment, may get the custody of the convict, or make a profit out of a contract to be made between the convict and his surety, in consequence of which the convict is detained and put to hard labor, such magistrate or other judicial officer cannot escape criminal responsibility to the United States for the conspiracy, and its natural and designed result, in the holding of a citizen in a condition of peonage or involuntary servitude, because the judicial officer has taken the precaution to veil his wrong in the form of an official act.

### Labor Law of 1901 Unconstitutional.

9. The act of the Legislature of Alabama, approved March 1, 1901 (Acts 1900–01, p. 1208, § 1), about which you inquire, makes it a penal offense, where a person, who has "contracted in writing to labor for or serve another for any given time, or any person who has by written contract leased or rented land from another for any specified time, or any person who has contracted in writing with the party furnishing lands, or the lands and teams to cultivate it, either to furnish the labor, or the labor and teams, to cultivate the lands," afterwards, without the consent of the other party, and without sufficient excuse, to be adjudged by the court, "shall leave such other party or abandon said contract, or leave or abandon the leased premises or land as

aforesaid," and take employment of a similar nature from another person, without first giving him notice of the prior contract.

Courts are always reluctant to exercise the delicate power of declaring a statute unconstitutional, and will avoid passing upon such questions when possible, consistent with the due administration of justice. In the phase in which the issue is presented, it is impossible to avoid it. You cannot properly perform your duties without advice as to the binding force of this statute, and the issue stares the court in the face, and must be met, unless the court abdicates its duty.

To constitute the offense under this statute, there must be, first, the written contract; second, the leaving of the service or premises without just excuse; third, the want of consent of the opposite party; fourth, the taking of employment of a similar nature from another person; fifth, without notifying him. Under the statute, the laborer or renter has done no criminal act in leaving or in abandoning the contract or premises. The act does not make the leaving an offense. All that amounts to, under this statute, is a breach of a civil contract. That creates only the relation of debtor and creditor. The statute, on the foundation, for the reason, that the relation of creditor and debtor results from the breach of the contract, commands the debtor, on peril of hard labor, not to work at his accustomed vocation for any one else, during the term of the contract, without the permission of the creditor, unless he informs his new employer of the first contract. Another statute, providing for this very contingency, declares, if the laborer or renter does inform the person of whom he seeks employment, the latter shall incur heavy pains and penalties if he employs him without the first employer's permission.

## Imprisonment for Debt.

What is this but declaring, if a man breaks his contract with his creditor without just excuse, he shall not work at his accustomed vocation for others without permission of the creditor? What is this but a coercive weapon placed by the law in the hands of the employer to compel the debtor to pay a debt, to perform the contract? Under the Constitution of Alabama there can be no imprisonment for debt, nor can it be treated, directly or indirectly, as a crime. The only constitutional method of enforcing a contract for personal service is to get judgment and execution, and have compensation for the broken contract by seizure and sale of the defendant's property.

It is not contended that leaving the service cannot under any circumstances be made a criminal offense. Doubtless it is competent for legislation to make it a criminal offense for an employé, without giving reasonable notice, to suddenly quit duties the continued performance of which, for the time being, under the conditions of the particular calling, is necessary to prevent the endangering of life, health, or limb, or inflicting other grievous inconvenience and sacrifice upon the public. Surely a train dispatcher, indicted for suddenly leaving the service without giving orders necessary to prevent the clash of opposing trains upon a railroad, could not successfully plead, when destruction of life and property were brought about by his sudden leaving, that he could not be punished, because he did no more

than breach a contract of service. In these and like cases, the criminal law would be exerted not to compel performance, or to prevent quitting the service in a reasonable way, but because, by abandoning it in an unreasonable way, the employé has created a condition of affairs, the natural, direct, and known result of which is to endanger life, health, or limb, or to inflict grievous public injury. This act is not planned with any such purpose. It does not attempt to make the leaving of the service, which is private in its obligation, an offense under any circumstances.

This statute practically attaints the debtor and makes him a legal pariah if he attempts to exercise his right to labor without another man's consent, and that man his creditor. One of the most valuable liberties of man is to work where he pleases, and to quit one employment and go to another, subject, of course, to civil liability for breach of contract obligations. These laws attempt to take this right away and destroy this liberty. When a man's liberties are taken from him because he does not pay a debt, and he is punished if he does not perform a civil contract, or "abandons the leased premises," the place where he agreed to do it, he is put in prison bounds, and is imprisoned for debt in the meaning of the Constitution. The statute, in effect, makes him a fixture to the place, because he owes a debt and does not perform a contract in order to liquidate it.

It is a fundamental principle of law that the legitimacy of the exercise of the police power, or any other legislative authority concerning the constitutional rights of the citizen, whatever the language employed in the statute, is to be tested and determined by its "natural and reasonable effect" upon that right. It is a maxim alike of the law and common sense that no power can be exercised indirectly which cannot lawfully be exercised directly. What is the "natural and reasonable effect" of the penalty imposed upon the laborer or renter for not giving information as to his broken contract before engaging in service elsewhere, when measured by the legal and practical consequences which inevitably follow? The laborer or renter who once enters into a contract and breaches it, no matter how righteously, subjects himself during the whole term of the contract to risk of prosecution if he takes like employment with others without first informing the subsequent employer of the prior contract. The mere quitting of the contract, whether rightly or wrongly, clouds and impedes his right to work for others during the whole time the contract is to run. The law provides no means for determining the justice of his excuse, at any time, in any mode, in any tribunal, unless he first risks the penalty of hard labor by taking the new employment without informing the subsequent employer of the prior contract. This is not required of any other freeman in the land, or exacted of any other debtor. It is a penalty imposed for debt. The person from whom he seeks employment may desire the service of the laborer or renter, and for that matter believe he was justified in quitting the former service; yet, almost invariably, the would-be employer will be deterred from giving work to the laborer or renter, because, in that event, he would assume the peril of maintaining the justice of

the laborer or renter's excuse, and, if he failed, of having to pay heavy fines and penalties. If, however, the debtor succeeds in convincing the new employer that he was justified in quitting, and so obtains employment, and the former employer insists that he was not, and notifies the new employer that he does not consent, the latter, in all probability, will dismiss the laborer or renter, rather than risk prosecution, under peril of heavy penalties, if he fails to show the laborer or renter had sufficient excuse for leaving. The penalty put upon the renter or laborer, if he mistakes the justice of his excuse for quitting, is ever hanging over him. His safety is never assured, except by judgment in his favor, after facing a jury in the prisoner's dock, to settle the right.

It is a matter of common knowledge that nearly all the farm laborers and land renters in the counties of this state to which the statute is applicable are men of very little means, and must rely upon advances or have work to support themselves and their families at all times. To a man in this condition a dispute or difference with his employer, resulting in the abandonment of the service, no matter what the right of the laborer or renter's contention, is calamitous in the extreme. The leaving of the service, whether with or without just excuse, puts insuperable obstacles in the way of earning a livelihood, by the sweat of his brow, elsewhere than with the first employer or on the rented premises. He must stay there, or else, leaving, must starve, or go to work elsewhere, which in most instances he cannot do except by violating this statute and running the risk of conviction for crime, by not informing the new employer. Practically, the law places the laborer or renter at the mercy of his first employer, because of the broken civil contract. An employer with such power over the sustenance and liberty of another is master of his destiny and liberty, and the laborer or renter in such a condition is a serf in all but name. These results, so damaging and harassing to the liberty and equality of the laborer and renter before the law, fall upon him because he has breached a former contract, and to coerce him to perform it. The penalty for not informing is put upon him because he has breached the contract, and the prohibition against his employment by those who know of the breach is aimed at him because he has breached his contract. The whole scheme and purpose and the inevitable effect of these statutes are to coerce the laborer or renter to pay a debt, return to a personal service, by stress of penal enactments leveled at his person in the one instance, and against his right to work in the other. No man can be lawfully compelled to disclose differences with former employers, or breaches of contract with others, as a condition precedent to the right lawfully to engage in the service of another, in order to coerce him to pay a debt or perform a contract of personal service. The debtor cannot be compelled to put himself upon the blacklist that he may be prevented from getting work without an employer's consent, in order to coerce him to the performance of a contract of personal service or the payment of a debt. All such legislation is plainly violative of our state Constitution.

## Odious Class Legislation.

This legislation is obnoxious to other fatal objections under our state Constitution. It is a vicious species of class legislation. Its criminal penalties are grafted only upon contracts between laborers and renters on farm lands, and their hirers or landlords. It is designed solely in the interest of the employer or landlord. The latter may discharge the laborer or renter, or fail to come up to promises to him, without sufficient excuse; yet this legislation gives the renter or laborer no unusual recourse against his employer or landlord, while, in effect, though not in name, it pronounces practical outlawry, in favor of the landlord, against laborers or renters regarding their right to labor and pursue their accustomed vocations, by attaching special and extraordinary penalties to their breaches of contracts with landlords and employers.

The Constitution of Alabama declares "all men are equally free and independent, and are endowed by their Creator with certain inalienable rights, among them, life, liberty and the pursuit of happiness." It also declares that "the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty and property, and when the government assumes other functions, it is usurpation and oppression." The Supreme Court of this state has declared that:

"Unequal, partial and discriminatory legislation, which secures rights to some favored class or classes, and denies them to others similarly circumstanced, who are thus excluded from the equal protection of the law, designed to be secured by the general law of the land, is in clear and manifest opposition to the letter and spirit of these provisions." Railroad Co. v. Morris, 65 Ala. 199.

More than once the Supreme Court of this state has quoted, approvingly, the declaration of a great jurist, that—

"The right of every individual must stand or fall by the same rule or law that governs every other member of the body politic or land, under similar circumstances. Every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were it otherwise, odious individuals and corporations would be governed by one law, and the mass of the community and those who made the law by another; whereas the like general law, affecting the whole community equally, could not have been passed." Wally's Heirs v. Kennedy, 2 Yerg. 554, 24 Am. Dec. 511.

More than once the Supreme Court of Alabama has approved this emphatic declaration from a great judge:

"It is manifestly contrary to the first principles of civil liberty and natural justice, and to the spirit of our institutions and laws, that one citizen shall enjoy privileges and advantages which are denied to all others under like circumstances; or that one shall be subject to losses, damages, suits, or actions from which others under like circumstances are exempted." Holden v. James, 11 Mass. 396, 6 Am. Dec. 174.

The most eminent of all the writers on constitutional law has written:

"Every one has the right to demand that he be governed by general rules, and a special statute, which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar

cases, would not be legitimate legislation, but such an arbitrary mandate as is not within the province of free government. Those who make the laws are to govern by promulgated established rules, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and countryman at plow. This is a maxim of constitutional law, and by it we test the authority and binding force of legislative enactment." Cooley, Const. Law, §§ 391, 393.

The same high authority declares:

"Equal protection and security must be given to all, under like circumstances, in the enjoyment of their personal and civil rights. All persons must be equally free to pursue their happiness, and to acquire and enjoy property, to have like access to the courts of the country for the protection of their persons and property, and the prevention and redress of wrong, and the enforcement of their contracts. No impediment must be interposed to pursuits, except as applied to similar pursuits by others under like circumstances. No greater burdens shall be laid upon one man than are laid upon others in a similar calling and condition."

The fundamental rights and privileges of the citizen must be the same everywhere in the state. Among them is the right of contract. Among them is the right to pursue any lawful calling, unfettered and unvexed by exactions not made of other men in like occupations under like circumstances. Why should a debtor seeking work in Montgomery county be compelled to tell a new employer of a former broken contract, while a debtor seeking work in Jefferson county is subject to no such restriction? Why should an employer in Montgomery county be fined if he knowingly hires an agricultural laborer who has improperly breached a contract without the former employer's consent, while the employer in Jefferson county may hire an agricultural laborer who has broken a like contract in Jefferson county in defiance of the former employer? Local conditions may justify police regulations, in one community, concerning a particular calling, different from those in another. This act was not designed for any such purpose, and, put upon that ground, has nothing to rest on. As said by our Supreme Court of a similar law, this act has "none of the characteristics of a law designed to regulate the subjects which properly fall within the purview of domestic police. There can be nothing so offensive or injurious in the act of hiring a single unemployed laborer for one's service as to require police regulations by the state." Joseph v. Randolph, 71 Ala. 506, 46 Am. Rep. 347. The consequences of the exercise of a fundamental constitutional right, and the measure of privileges as to it, no valid police regulation being undertaken, must be the same in every locality, on every class, and on every foot of soil in Alabama. These fundamental rights are as broad as the state, and cannot vary and change with county lines. Legislative power cannot arbitrarily single out particular classes of persons and put burdens upon them, bottomed upon breaches of their contracts, to prevent their working elsewhere, which are not enforced against other classes or persons, similarly circumstanced, who break like contracts. The lessee of premises in a city, or in the country, so long as the agreement does not relate to the making of a crop, and the laborer in the mine, factory, or forest, the servant in the household, the employé upon the railroad, the clerk,

123 F.—44

the mechanic, and the professional man, may each break their contracts to render service to a particular employer, without sufficient excuse, and afterwards make similar contracts, at will, with others, without first having to inform of their prior contract, or incurring the almost certain risk of being debarred thereby of the opportunity or rewards of new employment if they do. The landlord, the farmer, and every other person in Alabama, save the renter to make a crop and the laborer, may break a contract to labor or to do other service for others, without just excuse, and yet the arm of the state does not reach out, on that account, with criminal penalties to prevent his retrieving his fortunes in other like employment, or put him in peril of hard labor if he mistakes the justifiableness of his excuse in leaving, and in reliance upon it, impelled by necessity to obtain work, from which he will be debarred if he informs of it, conceals the first contract rather than remain in idleness and want. The laborer and land renter alone are made inferior in right, in the vital matter of earning a livelihood and the pursuit of their usual vocations, to all other citizens in the state, and subjected to burdens, inequalities, and pains from which all other citizens who may have unjustifiably broken contracts of personal service are entirely free. This statute strikingly presents a case where, in violation of the general law of the land, persons in uninfluential and humble occupations are "governed by one law, and the mass of the community and those who made the law by another; whereas, the like general law, affecting the whole community equally, could not have been passed." If such a law could withstand constitutional tests, it would be but the forerunner of other harsher exactions by which land renters and laborers would soon be reduced to the evils of "a condition of peonage" far more deplorable than those resulting from the institution in New Mexico. The old system, at least, put pains and penalties upon the master and servant alike, and used the power of the law with equal hand against both, to coerce performance of the contract of service.

### Former Laws Went as Far as Possible in a Free Country.

Every reflecting man recognizes the great evils resulting from the abandonment of farms by laborers and renters, without justifiable excuse, after obtaining advances and incurring indebtedness to the employer, sometimes leaving the crops when it is almost impossible to secure other labor to save them. Against this evil the statutes of Alabama have provided, as far as possible, under our form of government, by criminal enactment. Code Ala. 1896, § 4730. That section enacts that—

"Any person entering into a written contract for the performance of any acts or service, with the intent to injure or defraud his employer, and thereby obtains money or personal property from such employer, and with like intent and without just cause, and without refunding the money or paying for such property, refuses to perform such act or service, must, on conviction, be punished as if he had stolen it."

It applies to all classes of persons who commit the designated offense, and does not single out any particular class. This statute is constitutional. Persons duly convicted of violating its provisions,

and put to labor in consequence, are lawfully undergoing involuntary servitude. On these lines legislation cannot move at all, when the act complained of is not a crime, but the mere breach of the obligations of a contract. The "great, general, and essential principles" of government cannot be bent or swayed to the prejudice of renters or laborers, who are freemen and citizens, in order to improve the efficiency of our system of labor, or to avert the disastrous consequences to landlords and farmers which result in every other business in life when the obligations of contracts are not performed or respected. The gap once made by discrimination against laborers and renters, no other class of men would be safe from like discrimination. All other classes of society, alike with landlords and persons engaged in agricultural pursuits, are subject to losses and damages from the unreliability and dishonesty of debtors and employés who fail to perform contracts; but in all free governments the good sense of mankind, since the days when imprisonment for debt was abolished, has condemned and frowned down any attempt to coerce the performance of civil obligations by criminal penalties. If the statute had declared in terms that no person should furnish food and raiment to persons in certain occupations, in exchange for labor, when they had broken contracts of service without first obtaining the consent of their former employers, no one would fail to perceive that the statute made harsh and odious class distinctions against persons in those occupations. When the statutes declare that no one shall give croppers or laborers employment, if they break, without sufficient excuse, contracts of personal service with former employers, without their consent, what is this but declaring, because a person in a certain calling or occupation has broken a contract, that he shall not avail himself, no matter what his necessities, of the usual means, open to all other men, to obtain food or raiment, except by consent of a former employer? Can harsh discrimination between classes be more strongly drawn than here?

## Denial of Equal Protection of Law.

For the reasons already given, this statute is also violative of the Constitution of the United States. It is unjust discrimination against a class, and the denial of "the equal protection of the law" to laborers, and renters who contract to cultivate crops. It attaches consequences to the breaches of their contract obligations, and erects barriers to their right to pursue their usual callings, which are raised up by law against no other class of men under like circumstances. It attempts to coerce performance of their contracts of personal service by means unknown to the law of the land, in the same localities, upon breaches of like contracts by all other classes of citizens. A person convicted and put to hard labor for violating the provisions of this statute, because he did not give notice of the first employment before entering upon the second, is restrained of his liberty in violation of the Constitution of the United States, and is entitled to discharge on habeas corpus, notwithstanding he is held under a final judgment of a state court which remains unappealed and unreversed. Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed.

868. The act is plainly violative of the thirteenth amendment to the Constitution, and the statute passed, in pursuance thereof, against peonage. It establishes a system of peonage, and uses the arm of the law to keep persons in "a condition of peonage," whenever they "abandon the leased premises," by coercing performance of the "obligation" of contracts of "labor or service" by involuntary service.