UNITED STATES v. WHEELER et al.

(District Court, D. Arizona. December 2, 1918.)

No. C-692.

1. ARMY AND NAVY ⬤⟹20—SELECTIVE SERVICE ACT—DUTY OF REGISTRANTS TO REMAIN AT RESIDENCE.

Neither the Selective Service Act nor the regulations prescribed by the President required registrants to remain in their permanent homes and actual places of legal residence until drafted into military service, etc.

2. CRIMINAL LAW ⬤⟹5—WHAT LAW GOVERNS.

The offense of forcibly taking a person in the state and carrying into another denounced by Pen. Code Ariz. 1901, § 186, as well as the offense of false imprisonment denounced by section 205, are within the police power reserved to the states by Const. Amend. 10.

3. CRIMINAL LAW ⬤⟹5—WHAT LAW GOVERNS.

As the congressional legislation against kidnapping found in Criminal Code, §§ 268–271 (Comp. St. 1916, §§ 10441–10444), is expressly limited to the constitutional authority of Congress to legislate against slavery, etc., under Const. Amends. 13, 14, this amounts to a legislative declaration that kidnapping not so limited was left to be dealt with by the states under their police power; the expression of one thing excluding others.

4. CONSPIRACY ⬤⟹29—OFFENSES—FEDERAL LAW.

It was not a violation of Criminal Code, § 19 (Comp. St. 1916, § 10183), denouncing conspiracy to injure, etc., any citizen in the exercise of any right secured by the Constitution or laws of the United States for defendants to conspire to deport from Arizona citizens of the United States some of whom had registered under the Selective Service Act; the conspiracy not depriving those conspired against of rights secured by Const. art. 4, § 2, or Amendment 14, the federal statutes against kidnapping, etc., being inapplicable, and the Selective Service Act not requiring registrants to remain at their legal residences.

5. CONSPIRACY ⬤⟹29—CONSTRUCTION OF STATUTE.

Section 19 of the Criminal Code of the United States (Comp. St. 1916, § 10183) has the same meaning as when it was enacted as section 6, Act May 31, 1870. As there enacted it was intended to protect the political rights of citizens of the United States in the several states, and not their civil rights as mere persons, residents or inhabitants. Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 763, 30 L. Ed. 766.

6. CRIMINAL LAW ⬤⟹95—JURISDICTION—FEDERAL COURTS.

That it might be impossible to enforce the state law against kidnapping, etc., against defendants who conspired, etc., to deport citizens of the United States from Arizona, does not give the federal court jurisdiction of the prosecution; no federal law being violated.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Harry C. Wheeler and others were indicted for conspiracy in violation of Criminal Code, § 19. On demurrer. Demurrer sustained, and indictment quashed.

William C. Fitts, Sp. Asst. Atty. Gen., and Thomas A. Flynn, U. S. Atty., of Phœnix, Ariz.

E. E. Ellinwood, John Mason Ross, and Clifton Mathews, all of Bisbee, Ariz., for defendants Wilcox, Douglas, Rae, Merrill, Sherman, Cunningham, Allison, Watkins, Shattuck, Brophy, Tovrea, Hunt, Gannon, Johnson, Bledsoe, Hodgson, Howe, Sims, Snodgrass, Dowell, and Stout.

MORROW, Circuit Judge. This is a demurrer to an indictment charging the defendants with a conspiracy in violation of section 19 of the Criminal Code of the United States (Act March 4, 1909, c. 321, 35 Stat. 1092 [Comp. St. 1916, § 10183]).

The objection is that the facts stated in the indictment do not charge an offense within the constitutional provisions of that section. The section provides as follows:

"Sec. 19. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

The section was originally contained in section 6 of "An act to enforce the right of citizens of the United States to vote in the several states of the Union and for other purposes," approved May 31, 1870 (16 Stat. 140, 141, c. 114). It was afterwards contained in the Revised Statutes of the United States, enacted June 22, 1874, as section 5508, in chapter 7, entitled "Crimes against the Elective Franchise and Civil Rights of Citizens." The section is now contained in chapter 3 of the Criminal Code, bearing the same title as chapter 7, containing section 5508 in the Revised Statutes, did prior to the enactment of the Criminal Code.

This case is known to the public as the "Bisbee Deportation Case." It involves an alleged conspiracy on the part of the defendants, continuing from the 1st to and including the 12th day of July, 1917, to deport from Bisbee, in the state of Arizona, 221 persons to the state of New Mexico. The conspiracy was plainly a single act on the part of the defendants against all the persons to be deported; but for the purpose of classifying such persons with respect to their citizenship, and liability to the selective draft, the indictment has been split up into four counts, so as to charge the offense as a conspiracy directed against different classes of persons. This may be done, subject to certain limitations. United States v. Howell (D. C.) 65 Fed. 402; Orth v. United States, 252 Fed. 568, —— C. C. A. ——. These four counts

classify the persons against whom the conspiracy was directed as follows:

In the first count the whole number of 221 persons are described as citizens of the United States.

In the second count 25 of this number of persons are described as citizens of the United States residing in, but not citizens of, the state of Arizona.

In the third count, 196 of the persons mentioned in the first count are described as citizens of the United States and of the state of Arizona, residing in Arizona. There is also in this count a name not mentioned in the first count, making the number in this class 197. No objection is made to the indictment on this account.

In the fourth count 60 persons mentioned in the first count are described as citizens of the United States and of the state of Arizona, residing in said state, who were male persons between the ages of 21 and 30, required by the proclamation of the President of the United States, dated May 18, 1917, to present themselves on June 5, 1917, and who did present themselves, for and submit to registration under the provisions of the act of Congress approved May 18, 1917 (40 Stat. 76, c. 15).

It is alleged in the first count that the 221 persons against whom the conspiracy of the defendants was directed—

"were citizens of the United States, residing in the county of Cochise, in the state and in said district of Arizona, in the peace of said county, state, and district, and then and there as such citizens of the United States were exercising the right and privilege pertaining to citizens of said state peaceably there to reside and remain and to enjoy the blessings of liberty rather than in another state of the United States, and the right and privilege pertaining to citizens of said state to be immune from unlawful deportation from that state to another state, and then and there were not persons charged in any state with treason, felony, or other crime, who had fled from justice of said state, and had been found in said state of Arizona, or persons then in said state of Arizona, who had committed crimes or offenses against the United States in another state, or in other states, or persons not sentenced or imprisoned in a prison or prisons located in another state, or any other states, or persons subject to extradition to a foreign country or foreign countries."

It is charged that the defendants conspired and confederated together—

"to injure, oppress, threaten, and intimidate said citizens of the United States in the free exercise and enjoyment by them, respectively, of certain rights and privileges secured to them as such citizens by the Constitution and laws of the United States; that is to say, the rights and privileges aforesaid."

The rights and privileges "aforesaid" were the—

"right and privilege pertaining to citizens of the said state peaceably there to reside and remain and to enjoy the blessings of liberty rather than in another state of the United States, and the right and privilege pertaining to citizens of said state to be immune from unlawful deportation from that state to another state."

It is further charged that—

"Said unlawful and felonious conspiracy, combination, confederation, and agreement then and there was one for injuring, oppressing, threatening, and

intimidating said citizens of the United States in the free exercise and enjoyment of said rights and privileges, by unlawfully and with force and arms driving and conveying said citizens in a body from their said places of residence in said state of Arizona to and into another state, to wit, New Mexico, and threatening said citizens with great bodily harm and death if they should return or endeavor to return to said state of Arizona."

It is further charged that certain of the defendants in and for executing such conspiracy did certain overt acts set forth in the count.

The second count is the same as the first count, except that it is alleged that the 25 persons against whom the conspiracy was directed are described as citizens of the United States residing in, but not citizens of, the state of Arizona, who—

"were exercising the right and privilege pertaining to citizens of other states of the United States, other than said state of Arizona, peaceably there to reside and remain and to enjoy the blessings of liberty and the right and privilege of being immune from unlawful deportation from that state to another state."

The charge in this count is that the defendants conspired and confederated together—

"to injure, oppress, threaten, and intimidate the citizens in this count named in the free exercise and enjoyment by them, respectively, of certain rights and privileges, secured to them as such citizens by the Constitution and laws of the United States; that is to say, the rights and privileges in this count aforesaid."

The rights and privileges "in this count aforesaid" are the rights and privileges—

"pertaining to citizens of other states of the United States, other than said state of Arizona, peaceably there to reside and remain and enjoy the blessings of liberty and the right and privilege of being immune from unlawful deportation from that state to another state."

The third count is the same as the first count, except that it is alleged that the 197 persons therein named, against whom the conspiracy of the defendants was directed, were citizens of the United States and of the state of Arizona.

The fourth count is substantially the same as the first count, except that it is alleged that the 60 persons against whom the conspiracy was directed are described as—

"citizens of the United States and of the state of Arizona, residing in the county of Cochise, in said state, and in said district of Arizona, and were respectively male persons between the ages of 21 and 30, * * * who were then and there required by the proclamation of the President of the United States, dated May 18, 1917, to present themselves, and did present themselves, for and submit to registration under the provisions of the act of Congress approved May 18, 1917, * * * at divers registration places in divers precincts, * * * these precincts being the precincts where the citizens mentioned in this count of this indictment had their permanent homes and actual places of legal residence."

Against these persons so subject to the selective draft, it is charged that the defendants conspired—

"to injure, oppress, threaten, and intimidate in the free exercise and enjoyment by them, respectively, of the certain right and privilege secured to

them as such citizens by the Constitution and laws of the United States; that is to say, the right and privilege in the count aforesaid."

The right and privilege in the count aforesaid was—

"the right and privilege pertaining to citizens who had presented themselves for, and who had submitted to, registration as aforesaid, of remaining unmolested in their said permanent homes and actual places of legal residence, subject to draft and until drafted under the provisions of said act of May 18, 1917, into the military service of the United States."

[1] The act did not require registrants under the act to remain in their permanent homes and actual places of legal residence until drafted into the military service of the United States, nor did the selective service regulations prescribed by the President of the United States make such a requirement; but, on the contrary, the location of the registrant elsewhere than at his permanent home and actual place of legal residence at the time of his call into the military service was provided for in such regulations, and the absence from home of the registrant in no way prejudiced his rights under the act or under the regulations of the President.

Stripped of the verbiage required to state the various elements of the alleged conspiracy, we find that the injury charged in the four counts of the indictment may for the purpose of the present inquiry be reduced to the single charge of a conspiracy to injure, oppress, threaten, and intimidate certain citizens of the United States in the free exercise and enjoyment of the right and privilege, pertaining to citizens of the state of Arizona, peaceably there to reside and remain and to enjoy the blessings of liberty rather than in another state of the United States, and the right and privilege pertaining to citizens of said state to be immune from unlawful deportation from that state to another state.

[2] The offense which the defendants are charged to have conspired to commit is, then, an offense against the right and privilege of the persons conspired against, secured to them as citizens of the state of Arizona, and upon examining the law of that state we find that the charge in the indictment is correct in both form and substance, and that protection has been provided for such persons under the police power of the state. Section 186 of the Penal Code of 1901 of the state of Arizona provides:

"Every person who forcibly * * * takes * * * any person in this state, and carries him into another * * * state * * * is guilty of kidnapping"

—for which a punishment has been provided. Another aspect of the case is provided for in section 205 of the Penal Code, where it is enacted:

"False imprisonment is the unlawful violation of the personal liberty of another"

—for which a punishment has been provided.

The right of protection furnished by this police power of the state is a right reserved to the state under the Tenth Amendment of the Constitution of the United States, providing that:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

Whether this state protection is exclusive or not in a particular instance depends upon the question of whether the power has also been granted by the Constitution to the general government expressly or by necessary implication.

[3] Congress has provided a statute against kidnapping, to be found in sections 268–271 of the Criminal Code (R. S. §§ 5525–5527, and Act June 23, 1874 [Comp. St. 1916, §§ 10441–10444]); but this legislation is expressly limited to the constitutional authority of Congress to legislate against slavery, involuntary servitude, and peonage under the Thirteenth and Fourteenth Amendments to the Constitution. The Peonage Cases (D. C.) 123 Fed. 671; Clyatt v. U. S., 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726. This amounts to a legislative declaration that kidnapping, not so limited, was left to be dealt with by the states under their police power. "Expressio unius est exclusio alterius."

[4, 5] The question is broadly stated in the brief of the Assistant Attorney General in support of the indictment in this case as follows:

"We admit that the fundamental rights of a person as such, or of a citizen as such, are not secured to him by the Constitution of the United States. The rights to life, liberty, and the pursuit of happiness, for instance, existed before the Constitution, were not created by it, and hence are not secured by it, but by the Constitution and laws of the several states. If, however, these fundamental rights are brought into connection with the federal government, the situation is changed, and the right then becomes one secured by the Constitution of the United States."

He then proceeds to explain what he means by "fundamental rights" being "brought into connection with the federal government."

"For example," he says, "ordinarily the right to remain in any one place, or to move freely from place to place, is not secured by the Constitution of the United States; but if state boundaries are brought into the question, if the right claimed be to remain in one of the several states of the federal Union, as distinguished from another, or to move freely from one of the several states into another state of the federal Union, it then becomes a right secured by the Constitution of the United States"—citing Crandall v. Nevada, 6 Wall. 35, 18 L. Ed. 745; U. S. v. Patrick (C. C.) 54 Fed. 338–347.

In the case of Crandall v. Nevada, the question related to a capitation tax of $1 imposed by the statute of the state of Nevada—

"upon every person leaving the state by any railroad, stagecoach or other vehicle engaged or employed in the business of transporting passengers for hire."

The Supreme Court of the state held that this tax was not an impost on exports, nor an interference with the power of Congress to "regulate commerce among the several states," and upheld the statute. The case was taken to the Supreme Court of the United States, where the question whether the tax was an impost on exports, or was an interference with the powers of Congress to regulate commerce among the several states, was passed over, and the tax held to be the exercise of an authority by the state, affecting the functions of the

federal government and inconsistent with its constitutional operations. In support of this doctrine, the court refers to the extensive operations of the federal government, conducted through its various departments, with the citizens of the several states, and the necessity that such communications should be free and open, without any obstruction on the part of any of the states, and the court finds that the right of the state to impede or embarrass the constitutional operations of that government, or the rights which the citizens hold under it, has been uniformly denied. The court quotes from the opinion of Chief Justice Marshall in the case of McCullough v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, finding:

"That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very means, is declared to be supreme over that which exerts the control—are propositions not to be denied. If the states may tax one instrument employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax the patent rights; they may tax the papers of the custom house; they may tax judicial process: they may tax all the means employed by the government to an excess which would defeat all the ends of the government. This was not intended by the American people. They did not design to make their government dependent on the states."

Manifestly this finding of the Supreme Court, that the state has no power to obstruct or burden the operations of the federal government, has no application to the facts alleged in the present indictment. The facts here stated do not relate to any act of the state, and do not charge any intent or purpose on the part of the defendants to obstruct or burden the operations of the federal government, or to obstruct or burden the transportation of passengers from one state to another. There is a recital in the indictment relating to the crossing of the state boundary by the persons against whom the conspiracy was directed. Treating this recital as a charge, it does not state any fact from which an inference may be drawn that it was the intent or purpose of the defendants to burden or in any way obstruct or interfere with the operations of the government, to obstruct, burden, or impede the transportation of passengers from one state to another, or to prevent or obstruct the persons against whom the conspiracy is alleged to have been directed in moving freely from Arizona into any other state.

We do not see how the decision of the Supreme Court in Crandall v. Nevada can be held as decisive of the present case.

In the case of U. S. v. Patrick (C. C.) 54 Fed. 338, the defendants were indicted for conspiracy and murder under the first clause of section 5508 (section 19 of the Criminal Code) and section 5509 of the Revised Statutes. The conspiracy charged against the defendants under section 5508 was to injure, oppress, threaten, and intimidate certain designated citizens of the United States in the free exercise and enjoyment of a right and privilege secured them by the Constitution and laws of the United States; three of these persons are described as deputy collectors of internal revenue of the United States, and two

as deputy· marshals of the United States, and another as a person summoned as a "posse."

The particular right and privilege alleged to have been secured to these persons by the Constitution and laws of the United States and in the free exercise and enjoyment of which the conspiracy was formed and prosecuted to injure, oppress, threaten, and intimidate was the duty, right, and privilege on the part of the deputy collectors of internal revenue to make searches for and seizures of distilled spirits upon which the tax imposed by the laws of the United States had not been paid, and the duty on the part of the deputy marshals and of the person summoned as a "posse" to aid and assist in the search for and seizure of such distilled spirits, and the arrest of persons who might be discovered in the possession of such distilled spirits. All engaged in the performance of official duties for and on behalf of the federal government.

In support of the demurrer to the indictment in that case it was contended that the statute had for its object the protection of citizens in the free exercise and enjoyment of the rights and privileges secured to them as citizens by the Constitution, and not for the protection of officers of the United States engaged in the performance of duties as such. To this contention Judge Jackson, afterwards a Justice of the Supreme Court, replied:

"In respect to citizenship, and the rights and privileges incident thereto, it should be borne in mind that we have in the political system of this country, since the adoption of the Fourteenth Amendment to the Constitution, if such did not previously exist, both a national and state citizenship, corresponding with our dual form of government, state and federal, which owes allegiance to and is subject to the jurisdiction and entitled to the protection of each government within the sphere of their respective sovereignties. 'The same person may be at the same time a citizen of the United States and a citizen of the state; but his rights of citizenship under one of these governments will be different from those he has under the other. The government of the United States, although it is, within the scope of its powers, supreme, and beyond the states, can neither grant nor secure to its citizens rights or privileges which are not expressly or by implication placed under its jurisdiction. All that cannot be so granted or secured are left to the exclusive protection of the states.' U. S. v. Cruikshank, 92 U. S. 542 [23 L. Ed. 588]. Speaking generally, the Constitution and laws * * * add nothing to the rights of one citizen as against another, nor do they aim to protect one citizen from personal injury or violence by another within the limits of a state. These are matters coming properly within the sovereignty and jurisdiction of the states. But in respect to rights and privileges derived from the United States, or secured by their Constitution or laws, and exercised by their authority, within the scope of their powers and the sphere of their jurisdiction the general government may, under the legislation of Congress, protect its citizens. * * * The statute applies to any citizen in the exercise 'of any right or privilege secured to him by the Constitution or laws of the United States.' This language does not indicate or fairly imply that the right or privilege secured and exercised must be such right or privilege as is common to all citizens of the United States as such."

The case reviews the cases upon the question, and, referring to the fundamental rights which belong to any citizen as a member of society and who as such is protected by the state, quotes from U. S. v. Cruikshank, 92 U. S. 553, 554, 23 L. Ed. 588, where the Supreme Court said:

"Sovereignty for this purpose rests alone with the states. It is no more tne duty or within the power of the United States to punish for a conspiracy to falsely imprison or murder within a state than it would be to punish for false imprisonment or murder itself."

The court concludes that sections 5508 and 5509 are confined to rights and privileges which are created or secured by the Constitution, wherein depends the authority of Congress to legislate for the protection of its citizens, and that such authority can never be allowed to extend to offenses affecting rights and privileges of citizens which exist by state authority independent of the Constitution and laws of the United States. The indictment was accordingly held sufficient in charging a conspiracy to injure, oppress, threaten, and intimidate citizens in the free exercise or enjoyment of the rights and privileges secured to them as agents or officers of the government discharging functions conferred or exercising rights and privileges secured by its laws and for its benefit.

It is clear that this case does not support the present indictment. The persons against whom the conspiracy of the defendants is alleged to have been directed in this case were not officers of the federal government, nor were they exercising any authority under that government. In the Patrick Case, had the persons conspired against had no other claim to the protection of the United States than that of being citizens of the United States, with the rights pertaining to the citizens of the state, as alleged in the present indictment, the indictment in that case would clearly have been held insufficient, for the reason, as there stated, that such protection would rest alone in the state.

We do not overlook Judge Jackson's reference to Baldwin v. Franks (120 U. S. 678, 7 Sup. Ct. 656, 763, 30 L. Ed. 766) on page 347 of 54 Fed., and his comment that—

"If the party affected or injured by the conspiracy had been a citizen, it is clear that the offense charged would have been embraced by the provisions of said section."

But this comment cannot prevail against what we believe to be the plain meaning of the decision of the Supreme Court in Baldwin v. Franks, as we shall show when we reach that case in this review. To repeat:

"It is no more the duty or in the power of the United States to punish for a conspiracy to falsely imprison for murder in a state than it would be to punish for false imprisonment or murder itself."

The attorney for the United States cites the case of U. S. v. Waddell, 112 U. S. 76, 5 Sup. Ct. 35, 28 L. Ed. 673, holding that the exercise by a citizen of the United States of the right to make a homestead entry upon unoccupied land, and to reside thereon and be protected from personal violence with respect to such residence, is the exercise of a right secured by the Constitution and laws of the United States, and by analogy that such authority secures to a citizen the right to be and remain in a particular place under the protection of the federal government against violence on account of such residence. The

decision of the court carefully excludes that construction of the statute. The court says:

"The right here guaranteed is not the mere right of protection against personal violence. This, if the result of an ordinary quarrel or malice, would be cognizable under the laws of the state and by its courts. But it is something different from that. It is the right to remain on the land in order to perform the requirements of the act of Congress, and, according to its rules, perfect his incipient title."

In Logan v. U. S., 144 U. S. 263–285, 12 Sup. Ct. 617, 36 L. Ed. 429, the defendants were charged under section 5508 (section 19 of the Criminal Code) with a conspiracy to injure and oppress certain citizens of the United States who were in the custody of the deputy United States marshal under a lawful commitment to answer the indictments in a federal court for offenses against the laws of the United States. The charge was that the defendants conspired to injure and oppress the persons in the custody of the deputy United States marshal in the free exercise and enjoyment of the right to be protected from violence while in said custody. Upon this question the court said:

"The prisoners were in the exclusive custody and control of the United States, under the protection of the United States, and in the peace of the United States. There was a coextensive duty on the part of the United States to protect against lawless violence persons so within their custody, control, protection and peace; and a corresponding right to those persons, secured by the Constitution and laws of the United States, to be so protected by the United States. If the officers of the United States, charged with the performance of the duty, in behalf of the United States, of affording that protection and securing that right, neglected or violated their duty, the prisoners were not the less under the shield and panoply of the United States."

The indictment was held sufficient, not because the persons conspired against were alleged to be citizens of the United States, but because it was charged that they were in the custody of the deputy United States marshal and in that relation they were entitled to the protection of the United States.

The case of In re Quarles, 158 U. S. 532–536, 15 Sup. Ct. 959, 39 L. Ed. 1080, was a conspiracy to injure and oppress a citizen of the United States in the free exercise and enjoyment of the right and privilege to report to a deputy United States marshal that a person named had violated the internal revenue laws of the United States by carrying on the business of distilling without having given bond as required by law. The court held that—

"The right of the private citizen who assists in putting in motion the cause of justice, and the right of the officers concerned in the administration of justice, stand upon the same ground just as do the rights of citizens voting and of officers elected."

The court quotes from the case of Ex parte Yarbrough, 110 U. S. 651–662, 4 Sup. Ct. 152, 157 (28 L. Ed. 274), where the court said:

"The power in either case arises out of the circumstance that the function in which the party is engaged or the right which he is about to exercise is dependent on the laws of the United States. In both cases it is the duty of that government to see that he may exercise this right freely, and to protect

him from violence while so doing, or on account of so doing. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself, that its service shall be free from the adverse influence of force and fraud practiced on its agents, and that the votes by which its members of Congress and its President are elected shall be the free votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice."

The right of the citizen of the United States to vote had reference to the act of May 31, 1870, to enforce the right of citizens of the United States to vote in the several states of the Union. Section 19 of the Criminal Code now under consideration was section 6 of that act and as there contained had reference to the right of a citizen of the United States to vote.

In Motes v. U. S., 178 U. S. 458–462, 20 Sup. Ct. 993, 995 (44 L. Ed. 1150), the conspiracy was of the same character as in the Quarles Case, but the case involved other questions. So far as the right of the person conspired against to give information to an officer of the government of the violation of the internal revenue laws, the court said:

"It was the right and privilege of" the person conspired against "in return for the protection enjoyed under the Constitution and laws of the United States, to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws. That right and privilege may properly be said to be secured by the Constitution and laws of the United States. And it was competent for Congress to declare a conspiracy to injure, oppress, threaten or intimidate a citizen because of the exercise by him of such right or privilege to be an offense against the United States."

It follows, from this and other cases that might be cited, that the United States extends its jurisdiction and protection to its officers, agents, and employés against a conspiracy to injure, oppress, threaten, or intimidate them in the performance of their official duties. This jurisdiction and protection is also extended to citizens of the United States in the exercise of the right and privilege to freely pass from one state to another, or to the seat of government at Washington, to persons residing upon and making homestead entries upon public lands, and to persons engaged in service under or in connection with the constitutional operations of the government.

The United States also extends its jurisdiction and protection against any action of the state which impairs the constitutional privileges and immunities of citizens of the United States, or which injures them in life, liberty, or property, without due process of law, or which denies to any of them the equal protection of the laws, secured to them by the Fourteenth Amendment. In U. S. v. Cruikshank, 92 U. S. 542–554 (23 L. Ed. 588), the Supreme Court, in discussing the subject, said:

"The Fourteenth Amendment prohibits a state from depriving any person of life, liberty, or property, without due process of law; but this adds nothing to the rights of one citizen as against another. It simply furnishes an additional guaranty against any encroachment by the states upon the fundamental rights which belong to every citizen as a member of society. * * * The Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws; but this provision does not, any more than the one which precedes it, and which we have just considered, add anything to the rights which one citizen has under the Con-

stitution against another. The equality of the rights of citizens as a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power. That duty was originally assumed by the states; and it still remains there. The only obligation resting upon the United States is to see that the states do not deny the right. This the amendment guarantees, but no more. The power of the national government is limited to the enforcement of this guaranty."

In U. S. v. Harris, 106 U. S. 629–639, 1 Sup. Ct. 601, 609 (27 L. Ed. 290), the court refers to the provisions of the Fourteenth Amendment in the following terms:

"The language of the amendment does not leave this subject in doubt. When the state has been guilty of no violation of its provisions; when it has not made or enforced any law abridging the privileges or immunities of citizens of the United States; when no one of its departments has deprived any person of life, liberty, or property without due process of law, or denied to any person within its jurisdiction the equal protection of the laws; when, on the contrary, the laws of the state, as enacted by its legislative, and construed by its judicial, and administered by its executive departments, recognize and protect the rights of all persons—the amendment imposes no duty and confers no power upon Congress."

In the Civil Rights Cases, 109 U. S. 3, 11–17, 3 Sup. Ct. 18, 21 (27 L. Ed. 835), the court again discusses the subject, adding emphasis that it is a limitation upon the action of the state, and does not deal with the invasion of the individual rights, the court says:

"It does not invest Congress with power to legislate upon subjects which are within the domain of state legislation, but to provide modes of relief against state legislation, or state action, of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights, but to provide modes of redress against the operation of state laws, and the action of state officers executive or judicial, when these are subversive of the fundamental rights specified in the amendment. * * * In this connection it is proper to state that civil rights, such as are guaranteed by the Constitution against state aggression, cannot be impaired by the wrongful acts of individuals, unsupported by state authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the state, or not done under state authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the state for redress."

The United States also extends its jurisdiction and protection against state action by one state discriminating against citizens of another state. Section 2 of article 4 of the Constitution provides:

"Citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

The second count of the indictment seems to have had this constitutional provision in view, when it charged that certain citizens of the United States residing in Arizona, against whom the conspiracy was directed, were exercising the rights pertaining to citizens of other states of the United States; but this provision of the Constitution does not apply to acts of individuals. It is a limitation upon the action of the state. U. S. v. Harris, 106 U. S. 639, 1 Sup. Ct. 601, 27 L. Ed. 290,

supra. See, also, Le Grand v. U. S. (C. C.) 12 Fed. 577, an opinion by Mr. Justice Woods, who wrote the opinion in the latter case while sitting as Circuit Justice in the Eastern District of Texas, and who as a Justice of the Supreme Court wrote the opinion in U. S. v. Harris, supra. See, also, U. S. v. Morris (D. C.) 125 Fed. 322.

The prosecution on the oral argument relied very confidently upon the case of Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 763, 30 L. Ed. 766, heretofore referred to, as supporting the sufficiency of the indictment in this case. As we understand that case, instead of supporting the sufficiency of this indictment, the opinion of the court points very clearly and distinctly to its insufficiency. The conspiracy of the defendants in that case was to drive and expel certain Chinese aliens from the town of Nicolaus, in the state of California, where they were engaged in legitimate business and labor to earn a living under and by virtue of the treaties existing between the government of the United States and the emperor of China. The treaty of November 17, 1880, referred to, provided that the United States was to exert all its power to devise measures for the protection of Chinese laborers and Chinese of any other class residing in the United States, "and to secure to them the same rights, privileges, immunities and exceptions as may be enjoyed by citizens or subjects of the most favored nations, and to which they are entitled by treaty." The Chinese persons against whom the conspiracy of the defendants in that case was directed appealed to the jurisdiction of the United States court for the punishment of the defendants under the provisions of the statute, which included the section of the Revised Statutes here in controversy.

The question arose: "Who are the citizens of the United States to which the statute referred?" This was a controlling question under the statute, and a most important inquiry under the treaty, since the Chinese persons conspired against were entitled to appeal to the United States for the same protection as "enjoyed by the citizens or subjects of the most favored nations." The court, after referring to a number of cases on the subject, says:

"The person on whom the wrong, to be punishable, must be inflicted, is described as a 'citizen,' * * * sometimes used in popular language to indicate the same thing as resident, inhabitant, or person. That it is not so used in section 5508 in the Revised Statutes is quite clear, if we revert to the original statute from which this section was taken. That statute was the Act of May 31, 1870, c. 114, 16 Stat. 140, 'to enforce the right of citizens of the United States to vote in the several states of this Union, and for other purposes.' It is the statute which was under consideration as to some of its sections in United States v. Reese, supra, and from its title, as well as its text, it is apparent that the great purpose of Congress in its enactment was to enforce the political rights of citizens of the United States in the several states. Under these circumstances there cannot be a doubt that originally the word 'citizen' was used in its political sense, and as the Revised Statutes are but a revision and consolidation of the statutes in force December 1, 1873, the presumption is that the word has the same meaning there that it had originally.

"This particular section is a substantial re-enactment of section 6 of the original act, which is found among the sections that deal exclusively with the political rights of citizens, especially their right to vote, and were evidently intended to prevent discriminations in this particular against voters on account 'of race, color, or previous condition of servitude.' Sometimes, as

in sections 3 and 4, the language is broader than this, and therefore, as decided in United States v. Reese, those sections are inoperative, but still it is everywhere apparent that Congress had it in mind to legislate for citizens, as citizens, and not as mere persons, residents, or inhabitants."

This opinion is a clear and distinct interpretation of the statute, declaring that it deals exclusively with the political rights of citizens especially establishing their right to vote, and not with the rights of citizens as mere persons, residents, or inhabitants. In the more recent case of United States v. Bathgate, 246 U. S. 220, 38 Sup. Ct. 269, 62 L. Ed. 676, the court reiterated its opinion that—

"Section 19 of the Criminal Code, of course, now has the same meaning as when enacted as section 6, Act of May, 1870."

In this latter case, the court states as pertinent to the construction of this section the rule referred to by the Supreme Court in U. S. v. Lacher, 134 U. S. 624–628, 10 Sup. Ct. 625, 626 (33 L. Ed. 1080), where the court said:

"There can be no constructive offenses, and before a man can be punished his case must be plainly and unmistakably within the statute."

The attorneys for the United States contend that these cases as here interpreted do not determine the questions involved in this demurrer for the reason that the conspiracy alleged in the indictment was to extend in its effect across the border of the state of Arizona into the state of New Mexico and involve interstate transportation, a subject over which the United States has jurisdiction and extends its protection in certain specified particulars; but this is not sufficient to bring into play the federal jurisdiction punishing acts of the character described in the indictment. There must be a statute of the United States to that effect enacted by Congress pursuant to constitutional authority either express or clearly implied.

It is nowhere stated in this section, or in the act in which it was originally passed, or in the statutes as revised, that the right to be enforced was a right pertaining to interstate transportation. We have therefore no basis from which we can draw a clear or necessary implication that the facts stated in the indictment come within the constitutional scope of section 19.

[6] Why has this prosecution been brought in the federal court rather than in the state court, which had unquestioned jurisdiction of the offense charged? The Assistant Attorney General stated on the oral argument that it might be because there was such bias and prejudice in the community where the offense was committed against the persons complaining of the offense that the law of the state could not be enforced against the defendants. This is not a legal or constitutional ground of federal jurisdiction, although frequently urged as a ground of federal legislation covering subjects where local authority is unequal to the task of administering equal and exact justice to all; but it is difficult to understand the explanation in this case, if the large body of persons against whom the conspiracy is charged to have been directed were in fact bona fide citizens of the United States as claimed. Those that were citizens by naturalization proceedings were each re-

quired to prove to the satisfaction of the court by two witnesses at the time of naturalization that for five years prior thereto he had behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. Those that were native-born citizens should certainly have possessed an equally good moral character, have been equally loyal to the government of the United States, and equally attached to the principles of the Constitution of the United States, as those who had been naturalized. If this was the character of persons against whom the conspiracy was directed, we cannot understand why they could not submit their character and conduct to a tribunal in the community where they resided in proceedings against others for an open violation of the state law. The situation is indeed a lamentable one and one to be greatly deplored; but it ought not to influence this court to enlarge the statute to include an offense not within its constitutional authority. As stated by the Supreme Court in Hammer v. Dagenhart (recently decided) 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101:

"This court has no more important function than that which devolves upon it the obligation to preserve inviolate the constitutional limitations upon the exercise of authority, federal and state, to the end that each may continue to discharge, harmoniously with the other, the duties intrusted to it by the Constitution."

It follows from these considerations that the demurrer to the indictment must be sustained, and the indictment quashed; and it is so ordered.