UNITED STATES v. McCLELLAN et al.

(District Court, S. D. Georgia, E. D.   March 15, 1904.)

1. PEONAGE—POWER OF CONGRESS TO LEGISLATE.
Act March 2, 1867, c. 187, § 1, 14 Stat. 546 [U. S. Comp. St. 1901, pp. 1266, 1267], denouncing peonage and involuntary servitude in any form, and providing a punishment, is a valid exercise of power granted to Congress by Const. U. S. Amend. 13, forbidding slavery or involuntary servitude, except as punishment for crime, and declaring that Congress shall have power to enforce this by legislation.

2. SAME—WHAT CONSTITUTES CONDITION OF PEONAGE.
A condition of peonage, within the denunciation of Act March 2, 1867, c. 187, § 1, 14 Stat. 546 [U. S. Comp. St. 1901, pp. 1266, 1267], is the illegal holding of a person to involuntary servitude, to work out a debt or contract claimed to be due by the person so held to the person so holding.

3. SAME—JURISDICTION.
A federal court may entertain a prosecution for violation of Act March 2, 1867, c. 187, § 1, 14 Stat. 546 [U. S. Comp. St. 1901, pp. 1266, 1267], denouncing peonage, though prosecution of the same acts under the name of kidnapping and false imprisonment might be held in the state courts.

Alexander Akerman, Asst. U. S. Atty.

W. M. Toomer, Leon A. Wilson, and John C. McDonald, for defendants.

SPEER, District Judge.   The indictment in this case charges the prisoners, one of whom was the sheriff of Ware county, and another an attorney at law practicing in the courts, with forcibly seizing certain citizens, known under the law of Georgia as "persons of color," and selling them to other persons, to be held by force, and compelled by force to labor in a state of involuntary servitude, which is termed "peonage." A demurrer to the indictment was interposed. There are a number of such cases, and it is agreed in judicio by the assistant district attorney, who represents the government, and by the counsel for the prisoners, that the arguments made in this case shall suffice for all. The indictment is as follows:

"The grand jurors of the United States, selected, chosen, and sworn in and for the Eastern Division of the Southern District of Georgia, upon their oaths present: That heretofore, to wit, on the eleventh day of August in the year of our Lord one thousand nine hundred and two, one Thomas J. McClellan, late of said division and district, within said division and district, and within the jurisdiction of this court, did then and there knowingly and unlawfully cause one John Wesley Boney to be held to a condition of peonage; for that the said Thomas J. McClellan in the county of Ware, in the state of Georgia, did forcibly seize the body of the said John Wesley Boney, without his consent and without authority of law, and did then and there sell the body of the said John Wesley Boney, without his consent and without authority of law, to Edward J. McRee, William McRee, and Frank I. McRee, and did then and there forcibly and against the will of him, the said John Wesley Boney, and without authority of law, deliver him, the said John Wesley Boney, into the custody of the said Edward J. McRee, William McRee, and Frank I. McRee, then and there causing him, the said John Wesley Boney, to be held by the said Edward J. McRee, William McRee, and Frank I. McRee to a condition of peonage; for that the said Edward J. McRee, William McRee, and Frank I. McRee then and there so having obtained the custody of the body of the

said John Wesley Boney, did then and there, by force and against the will of him, the said John Wesley Boney, and without authority of law, transport the body of the said John Wesley Boney to the county of Lowndes, in said state, and did then and there hold the said John Wesley Boney, against his will, to labor for them, to work out a debt which they, the said Edward J. Mc-Ree, William McRee, and Frank I. McRee, claimed to be due them by the said John Wesley Boney, and to labor under the terms of an alleged contract between them, the said Edward J. McRee, William McRee, and Frank I. McRee, and said John Wesley Boney; he, the said Thomas J. McClellan, then and there well knowing that the said John Wesley Boney would be so held as aforesaid by the said Edward J. McRee, William McRee, and Frank I. McRee; whereby, in the manner aforesaid, the said Thomas J. McClellan did cause the said John Wesley Boney to be held to a condition of peonage; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the said United States."

The law upon this subject is found in the act of Congress approved March 2, 1867, c. 187, § 1, 14 Stat. 546, entitled "An act to abolish and forever prohibit the system of peonage in the territory of New Mexico and other parts of the United States." This act, by the codifiers of the Revised Statutes, has been distributed in several sections—1990, 1991, 5526, and 5527 [U. S. Comp. St. 1901, pp. 1266, 1267, 3715, 3716]. It is, however, serviceable to the correct understanding of the law that the act should be considered in the precise form in which it was enacted. The material section is the first. It provides:

"That the holding of any person to service or labor under the system known as peonage, is hereby declared to be unlawful, and the same is hereby abolished and forever prohibited in the territory of New Mexico, or in any other territory or state of the United States; and all acts, laws, resolutions, orders, regulations, or usages of the territory of New Mexico, or of any other territory or state of the United States, which have heretofore established, maintained or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, be, and the same are hereby declared null and void; and any person or persons who shall hold, arrest, or return, or cause to be held, arrested, or returned, or in any manner aid in the arrest or return of any person or persons to a condition of peonage, shall, upon conviction, be punished by fine not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one nor more than five years, or both, at the discretion of the court."

This act is denounced by the demurrers, first, for the alleged reason that it was beyond the constitutional power of Congress; and, secondly, because it does not apply to the illegal sale, holding in imprisonment, and labor of the citizen.

It is, perhaps, not inappropriate that the court should express its appreciation of the erudite arguments based upon careful research made by the learned counsel for the prisoners and for the government. Nor is it unmindful of the voluntary aid afforded by statesmen and others trained in the same school of constitutional construction with the prisoners' counsel. That a chairman of a penitentiary committee of the Georgia Senate appeared for the prisoners; that a member of the House judiciary committee in Congress, from the district of the prisoners, contributed a brief in their behalf; that a solicitor-general of the state court in their state judicial district, charged with the prosecution

of such offenses under the state law, sat with the prisoners and their counsel during the hearing—taken altogether, is somewhat persuasive of the conclusion that if there is no system of peonage de jure, to which the statute applies, there is yet a de facto system of some equivalent sort, which has evoked the liveliest apprehensions of those who participate in its operation and emoluments, and of others whose sentiments toward it are not wholly antipathetic.

Notwithstanding the comprehensiveness of the arguments, the inquiry presented by the demurrers may be somewhat succinctly presented: Did Congress have the power to enact this legislation; does the legislation itself apply to the illegal arrest and sale of a citizen into involuntary servitude, as set out in the indictment; and is the indictment technically sufficient?

It does not seem difficult to find authority in the Constitution for this legislation. The thirteenth amendment provides:

"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Sec. 2. Congress shall have power to enforce this article by appropriate legislation."

This amendment went into effect on the 18th day of December, 1865. This long antedated the reconstruction period. The white people of the Southern states reorganized their state government with unreserved acquiescence in the abolition of slavery. Here, then, is the constitutional power of Congress to enact this legislation. The power is as unquestionable as that to regulate interstate and foreign commerce, to establish post offices and post roads, or to provide a uniform system of bankruptcy. Then Congress, by appropriate legislation, can prevent involuntary servitude. It is wholly fallacious to contend that this legislation must be directed at state action. There is no such limitation in the thirteenth amendment. That this is true of the fourteenth amendment, as argued at length, may be conceded, without impairing the grant of power in the thirteenth amendment which Congress exercised. No recourse, then, need be had to the fourteenth amendment, and why embark into a discussion of the powers of Congress therein granted? Indeed, the statute making peonage and involuntary servitude penal was approved more than eight months before the fourteenth amendment was proclaimed to be a part of the Constitution.

The case of United States v. Harris, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290, on which the prisoners' counsel rely, related to another and wholly different section of the Revised Statutes. This was an attempt to secure citizens against conspiracies to deprive them of the protection afforded by State laws. It impinged upon state authority, and the court declared it unconstitutional; but even there, Mr. Justice Wood, for the court, observes:

"It is clear that this amendment [the thirteenth], besides abolishing slavery and involuntary servitude within the United States, gives power to Congress to protect all persons within the jurisdiction of the United States from being in any way subjected to slavery or involuntary servitude, except as a punish-

ment for crime, and in the enjoyment of that freedom which it was the object of the amendment to secure."

Again, in the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835, where the Supreme Court of the United States, in pursuance of the uniform policy of the national judiciary to conserve the just rights of the states, denied the power of Congress to enact measures of incalculable consequence to the peace and happiness of the Southern states, Mr. Justice Bradley, discussing the thirteenth amendment, said:

"By its own unaided force and effect, it abolished slavery and established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character, for the amendment is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States."

And said Mr. Justice Miller in the Slaughterhouse Cases, 16 Wall. 36, 21 L. Ed. 394.

"Undoubtedly, while negro slavery alone was in the mind of the Congress which passed the thirteenth article, it forbids any other kind of slavery, now or hereafter."

Indeed, the denunciation of involuntary servitude by the first clause of the thirteenth amendment would be an ample grant of power to enact this law, if the second clause of the amendment had been wholly omitted. To hold otherwise is in the language of Justice Miller in Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274, to "destroy at one blow, in construing the Constitution of the United States, the doctrine universally applied to all instruments of writing— that what is implied is as much a part of the instrument as what is expressed." The denial of this power can only be supported by what the same learned justice in the same case terms "the old argument, often heard, often repeated, and in this court never assented to, that, when a question of the power of Congress arises, the advocate of the power must be able to place his finger on words which expressly grant it." Our whole postal system is based upon the terse power in Congress "to establish post offices and post roads." There is no provision in the instrument authorizing an enactment to punish burglary of a post office, or the forgery of a postal note, or the theft of a letter, and yet there are a multitude of statutes defining and punishing such offenses, the validity of which are unquestioned. Why? Because the government of the United States not only possesses and exercises all the powers which the Constitution expressly grants, but all other powers which are necessary to the effective operation of those thus granted. Indeed, Congress, by clause 18 of section 8, art. 1, of the Constitution, is expressly empowered "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof." As in a multitude of cases which from time to time have been argued since the organization of the government great use is sought to be made of the

tenth amendment, which reserves to the states "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states." But, as we have seen, all powers are delegated which are necessary to the effectiveness of those powers which are expressly delegated.

If the interesting but somewhat archaic argument which has been so often presented before, and which is pressed now, should prevail, the Constitution of the United States must ex necessitate have been practically as voluminous as the Constitution and statutes combined. We conclude, then, the denunciation of slavery or involuntary servitude in the Constitution is the grant of power to Congress to prevent it in every foot of that territory under the ægis of the Stars and Stripes.

. It is, however, urged that the term a "condition of peonage" imports a system of peonage. This, however, does not follow. A "general condition of peonage" might be synonymous with a "general system of peonage," but a citizen held and worked by lawless methods against his will for the purpose of compelling him in this manner to discharge a real or alleged obligation is, in contemplation of law, held in a condition of peonage. The words "a condition of peonage," as used in this sense, should be broadly construed in favor of the liberty of the citizen. There can be no more salutary rule of statutory construction. This is the view of Judge Jones, of the Middle District of Alabama, as expressed in his charge to a grand jury, reported in the Peonage Cases (D. C.) 123 Fed. 679:

"The phrase 'condition of peonage' means the actual status, physical and moral, with the inevitable incidents to which the employe, servant, or debtor was reduced under that system, when held to involuntary performance or liquidation of his obligation."

It is, moreover, urged that, even if Congress was granted power to make laws which impose penalties on those who hold the citizen in involuntary servitude, it did not intend to do so by this legislation. The familiar expedient of reference to the debates in Congress is resorted to, to support this contention. This recourse is superfluous, for, when the words of the statute are plain and unambiguous, they are taken to import what they plainly mean. What can be plainer than this language of the act, all of which has been hereinbefore set out?

"And any person or persons who shall hold, arrest, or return, or cause to be held, arrested or returned, or in any manner aid in the arrest or return of any person or persons to a condition of peonage, shall upon conviction be punished," etc.

It is, however, urged that the debate in the Senate shows Congress started out merely to abolish the system of peonage which existed in New Mexico. This is probably true. But Congress may start out to do one thing and do much more. Congress may set out to appropriate money for the support of the War Department, and may attach a measure giving the Secretary of War primary jurisdiction over the Philippine Islands. Innumerable indeed are the provisions of positive law which have been enacted upon appropriation bills. It is quite possible that, when the Senate of the United States began to frame this statute,

it had chiefly in mind the hapless condition of the New Mexican peons; but reflection, the wisdom of which subsequent history has unhappily made manifest, may have convinced them that there might be peonage, in every material sense, elsewhere in this land of the free. But whether this be true or not, there is the unequivocal denunciation of the crime, and the court and the country need not look beyond it, to ascertain what was in the breast of the legislators.

It does not seem to me that this is a question upon which the courts of the country should be astute to discover reasons to nullify an act of Congress made in favorem libertatis. The substantial inquiry is, did the accused consign or hold the citizen in a condition of involuntary servitude for the purpose of compelling him to work out a real or alleged obligation. This, if done, created a condition of peonage. A peon is defined as "a debtor held by his creditor in a qualified servitude to work out the debt." Black's Law Dictionary. The involuntary servitude prohibited by the Constitution is a personal servitude, and this "consists in the subjection of one person to another. If it consists in the right of property which a person exercises over another, it is slavery. When the subjection of one person to another is not slavery, it consists simply in the right of requiring of another what he is bound to do or not to do. This right arises from all kinds of contracts or quasi contracts." 2 Bouvier, p. 986. It follows, then, that an unwilling servitude enforced by the stronger to collect a debt is to reduce the victim to the condition of a peon, and logically to a condition of peonage.

It is, however, insisted that, while the conduct described in the indictment may be within the letter of the statute, it is not within the statute, because not within the spirit of the law; and this quotation from Lord Coke is cited:

"Acts of Parliament are to be so construed as no man that is innocent or free from injury or wrong be, by a literal construction, punished or endamaged."

But how can it be contended that the conduct of the prisoners, as described in this indictment, is innocent or free from injury or wrong. Is it not inimical to the amendment of the Constitution which defines involuntary servitude? Is it not involuntary servitude to seize by force, to hurry the victim from wife and children, to incarcerate him in a stockade, and work him in range of the deadly muzzle of the shotgun, or under the terror of the lash, and continue this servitude as long as resentment may prompt, or greed demand? It is true that a literal construction will not be favored, if the object be to punish those who are innocent, or free from injury or wrong. This was the decision of the Supreme Court in the Case of the Trustees of Holy Trinity Church, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, on which counsel for the accused rely. There it was held that, although the act of Congress prohibited a contract with an alien for labor and services of any kind in the United States, yet it did not apply to the rector of a church, although his pastoral duty implied both services and labor. There the statute was construed in favor of liberty. But what parallel is there between the holy ministrations of the man of God, though serv-

iceable and laborious, and the conduct of lawless and violent men who would seize helpless and pathetic negroes, and for their own selfish purposes consign them to a life of involuntary servitude, compared to which the slavery of ante bellum days was a paradise. And it otherwise appears that the construction of this act which seems to us proper is in salutary accord not only with the spirit of Congress in adopting it, but with other statutes for the same general purpose, which portray unmistakably the consistent purpose to stamp out on American soil any and every form of involuntary servitude. We refer to the act of May 21, 1866, c. 86, § 1, 14 Stat. 50, section 5525, Rev. St. [U. S. Comp. St. 1901, p. 3715], which provides:

"Every person who kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude, or held as a slave; or who entices, persuades, or induces any other person to go on board any vessel or to any other place with the intent that he may be made or held as a slave, or sent out of the country to be so made or held; or who in any way knowingly aids in causing any other person to be held, sold, or carried away to be held or sold as a slave, shall be punished by a fine of not less than five hundred nor more than five thousand dollars, or by imprisonment not more than five years, or both."

This legislation was also enacted before the proclamation of the fourteenth amendment, and its author was the Honorable Charles Sumner, Senator from Massachusetts. Primarily designed, as appears from the preceding section—5524 [U. S. Comp. St. 1901, p. 3715]—and the debate in Congress, to prevent kidnapping and sale of Southern negroes to Cuba and other slaveholding countries, it was so framed as to make penal the act of any person "who kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude." This is another instance of the exercise by Congress of the power granted by the thirteenth amendment to prevent involuntary servitude by a penal statute acting directly on the individual offender. The act of June 23, 1874, c. 464, § 1, 18 Stat. 251 [U. S. Comp. St. 1901, p. 3647], is another pertinent illustration of this constant purpose. Again the bill was introduced by the Honorable Charles Sumner, but he died before its passage. It appears that subsequently it was reported by Mr. Cessna from the House judiciary committee, was adopted by the House, and, as amended by the Senate, became the law on the date mentioned. In advocacy of the bill, Mr. Sumner stated that there were about 5,000 Italian children in the United States who had been kidnapped or inveigled, brought to this country, and held in a condition of involuntary servitude. It provides:

"That whoever shall knowingly and wilfully bring into the United States, or the territories thereof, any person inveigled or forcibly kidnapped in any other country, with intent to hold such person so inveigled or kidnapped in confinement or to any involuntary service, and whoever shall knowingly and wilfully sell or cause to be sold, into any condition of involuntary servitude, any other person for any term whatever, and every person who shall knowingly and wilfully hold to involuntary service any person so sold or bought, shall be deemed guilty of a felony, and, on conviction thereof, be imprisoned for a term not exceeding five years and pay a fine not exceeding five thousand dollars."

. Its special purpose was manifest not only by the title, but by its phraseology; but in its broader scope, before it was completed, appears this vivid and vital language, "and whoever shall knowingly and wilfully sell or cause to be sold into any condition of involuntary servitude any other person for any term whatever, shall be deemed guilty," etc. It is not necessary, in the opinion of the court, to hold that the count of the indictment hereinbefore set out will find additional support in one or both of these statutes, although this might be argued on strong grounds of reason and authority. They are mainly cited to show a constant purpose on the part of the national legislature to protect all persons within our boundaries from involuntary servitude, of whatever sort, and further to demonstrate the reiterated exercise by Congress of the salutary constitutional power now challenged. Of the illustrious author of these statutes to preserve human liberty, we may all now adopt the language which was spoken of him many years ago by the not less illustrious son of Georgia, the late L. Q. C. Lamar:

"Charles Sumner was born with an instinctive love of freedom, and was educated from his earliest infancy to the belief that freedom is the natural and indefeasible right of every intelligent being having the outward form of man. In him, in fact, this creed seems to have been something more than a doctrine imbibed from- teachers, or a result of education. To him it was a grand intuitive truth, inscribed in blazing letters upon the tablet of his inner consciousness, to deny which would have been for him to deny that he himself existed."

In view of the political complexion of this question, to which somewhat veiled reference has been made, the court deems it appropriate to refer to the degrading and un-American effect of involuntary servitude upon every concern of a self-respecting people. Already protests are heard from organized labor, and from manufacturers as well, against the baleful competition of convict-made goods. How much worse will be that competition, with the labor or products of the peon? The first are manufactured under the control of law; the other, under the will of a taskmaster, merciless, perhaps, as the Egyptian who drove the energies of the ancient people of God. How can the plain farmer, or manufacturer of turpentine or lumber, who labors for himself, with the assistance of his sons or hired help, hope for fair play in the market, when a huge sawmill in the vicinity, or an unscrupulous planter, with a stockade full of unpaid hands, can underbid his prices? Why should one man, through lawless methods, be permitted to grow rich, while his neighbors, who piously respect the law and the rights of their fellow man, however humble, shall forever toil on, perhaps in poverty and want? The demoralization of the spectacle to the plastic mind of youth, the incalculable harm flowing from the triumphant defiance of law, the reproach to the fair fame of our beloved state, all are involved in this supreme question. And, besides, what hope can the respectable negro have—what incentive to better effort or better life—if he, his wife, his daughters, or his sons, may in a moment be snatched from his humble home and sold into peonage? Let us for a moment put ourselves in his place, and imagine our furious indignation or hopeless despair if our loved ones or ourselves could be subjected

to such a condition of involuntary servitude. Nor, if conditions like these described in the indictment shall continue, will the negro remain the sole victim of peonage. Crime is ever progressive. Very many poor and ignorant white people are scarcely less hapless than negroes, and cases are already reported where white men have been made in this way the victims of powerful and unscrupulous neighbors.

But it is urged that the courts of the state have jurisdiction of this crime, under the name of "kidnapping and false imprisonment." So they have, and no word we say ought to discourage their officers in the performance of their duty to prosecute and convict. So they have jurisdiction of the burglary of a post office, but that does not nullify the jurisdiction of the national courts to try the same crime. The jurisdiction of both courts is here concurrent, and no man would be quicker than the presiding judge of this court to applaud righteous convictions for these crimes in the courts of the state. There are innumerable illustrations of the concurrent jurisdiction of the state and national courts. They afford no reason, however, why either court, with a case properly before it, should refuse to proceed in the exercise of such jurisdiction. And after all, what just cause of complaint is there? These prisoners, if tried, will be tried by Georgians. A Georgia judge, a Georgia prosecuting attorney, a Georgia marshal appear, and no one but Georgians are eligible as jurors. Away, then, with the pretense that the rights of Georgians are here imperiled or threatened. If here the guilty are not permitted to escape, here the innocent are never punished.

From these considerations, it is concluded that the act of March 2, 1867, denouncing peonage and involuntary servitude in any form, is a valid exercise of a power granted to Congress by the thirteenth amendment to the Constitution of the United States, and that the court has jurisdiction.

We are further of the opinion that a condition of peonage, comprehended by that act, is described in these indictments. It is the illegal holding of any person to involuntary servitude to work out a debt or contract claimed to be due by the person so held to the person so holding.

Little stress was made in the argument on the insufficiency of the indictment, and it seems to the court in all respects sufficient.

The demurrers will be ordered overruled, and the prisoners put to plead.