## UNITED STATES v. INGALLS et al.
### Cr. No. 10568–SD.

District Court, S. D. California, S. D.
July 29, 1947.

James M. Carter, U. S. Atty., and Ernest A. Tolin and Betty Marshall Graydon, Asst. U. S. Attys., all of Los Angeles, Cal., for plaintiff.

Clifford K. Fitzgerald, of San Diego, Cal., for defendants.

WEINBERGER, District Judge.

The defendant Elizabeth Ingalls, having been convicted by a jury, and now moving for a new trial, is charged in Count 1 of an indictment as follows:

"On or about October 11, 1946, defendants, Elizabeth Ingalls and Alfred Wesley Ingalls, did entice persuade and induce another person, namely, Dora L. Jones, to go from Berkeley, Alameda County, California, to Coronado, San Diego, County, California, within the Southern Division of the Southern District of California, with the intent that said other person, namely, Dora L. Jones, be held as a slave."

The motion for a new trial challenges the sufficiency of the evidence and also asserts that the Court erroneously defined "slave" to the jury.

There is a abundance of evidence which establishes that for many years prior to the date charged in the indictment, defendant Elizabeth Ingalls kept one Dora L. Jones, a negro woman, in her household as a servant during a period in excess of twenty-five years. There is evidence that during an uninterrupted period of in excess of twenty-five years said servant was required to arise at an early hour in the morning and perform practically all of the household labor in connection with the maintenance of the Ingalls household. She was forbidden to leave the household except for the commission of errands and performed drudgery of the most menial and laborious type, without compensation. She had no days off from her work, no vacation. Her quarters were among the poorest in the several homes occupied by the defendant during this period of years. There is evidence that the food furnished to her by defendant was of a substantially lower standard than that common to servants generally. She was denied the right to have friends and was required to send away a relative who called upon her. There is evidence that she was physically abused on several occasions. When she protested and asserted that she would leave the service of defendant Elizabeth Ingalls, that defendant reminded her of an adulterous relationship which had existed intermittently over a period of three years between the first husband of Mrs. Ingalls and Dora Jones, and of an abortion to which Dora Jones had submitted because of a pregnancy resulting 'from said relationship; that on such occasion Mrs. Ingalls would threaten to have Dora Jones committed to prison because of the former existence, about 38 years ago, of such relationship, and because of such abortion. Dora Jones had come into the service of the defendant at the age of seventeen years, her earlier life having been spent in Athens, Alabama. She testified that she believed the defendant could and would execute the threat frequently made and have her committed to prison if she left the defendant's service. She testified further that the defendant told her she was not bright, mentally, and could not make her way in the competitive world and would—if not sent to prison— be committed to a mental institution. It appears that these threats and numerous others acted effectively upon the servant to hold her against her free will in the service of the defendant until the early morning of October 11, 1946, on which date a daughter of the defendant induced the servant to leave the family automobile in which she was required to sleep during a cross-country trip. Thereafter on the same

day, in the presence of a member of the Berkeley, California, Police Department, the defendant renewed to the servant the threat that she could, and would, have her placed in prision if she persisted in leaving her, and also made other threats of retaliation, not only to the victim but concerning those who had aided her in escape. The servant testified that because she feared these threats would be executed, she left the Police Station in custody of the defendant and her husband and returned to their service. That night she was required to sleep on the floor of a hotel room although there were rooms available and the hotel had no restriction against providing such rooms to a person of the negro race. The defendant took the servant with her to an exclusive hotel at Coronado, California. This hotel had accommodations for the housing of servants of its guests, but the defendant made no application in behalf of Dora Jones therefor, and while the defendant enjoyed the commodious facilities of the hotel in her own behalf, she required the servant to sleep in the family automobile parked upon the public streets for the period of about a month, during which time the servant subsisted upon meager meals brought to her in the car and on occasions fed her in the defendant's room. Thereafter, when the defendant moved into a house, at Coronado, California, the servant again did all of the household work without compensation, and on at least one occasion when she rendered a small outside service to another for compensation, the defendant took that compensation from her.

These facts, gleaned from a great mass of other evidence of similar treatment, compel the conclusion that the servant, Dora L. Jones, was a person wholly subject to the will of defendant; that she was one who had no freedom of action and whose person and services were wholly under the control of defendant and who was in a state of enforced compulsory service to the defendant.

■ The Court, in charging the jury, instructed it as follows:

"The indictment charges the defendants with the intent to hold Dora L. Jones as a slave. I shall, therefore define the word 'slave' for you.

"A slave is a person who is wholly subject to the will of another, one who has no freedom of action and whose person and services are wholly under the control of another, and who is in a state of enforced compulsory service to another."

It must be borne in mind that many definitions of slavery were formulated at a time when slavery was lawful in the United States, and that the Thirteenth Amendment not only abolished slavery of persons of the negro race, but empowered the Congress to enact legislation prohibiting slavery. There is, therefore, no de jure slavery in the United States, and there was none at the time of the enactment of Section 443 of Title 18, U.S.Code, 18 U.S.C.A. § 443, the statute under which this prosecution was had. Dictionary definitions published even before the Thirteenth Amendment was enacted, recognized that there were many shades of meaning of the word, which did not include all the incidentals of lawful slavery in the United States, as it applied to negro slaves who were bought and sold as chattels and whose issue were the property of their owner.

Noah Webster's "American Dictionary of English Language," published in 1850, defines "slave" as follows:

1. "The noun 'slave,' a person who is wholly subject to the will of another, one who has no freedom of action but whose person and services are wholly under the control of another. In the early state of the world and to this day, among some barbarous nations, prisoners of war are considered and treated as *slaves*. The *slaves* of modern times are more generally purchased like horses and oxen.

2. "One who has lost the power of resistance; or one who surrenders himself to any power whatever; as, a slave to passion, to lust, or to ambition. (Waller)

3. "A mean person, one in the lower state of life.

4. "Is a drudge, one who labors like a slave."

A dictionary published in London, written by Stormouth in 1886, gives the following definition:

"A slave supposed to be taken from Sclavi, the name of the Sclavonian race, a common source for slaves in early times; old Dut. slavven (a slave, anyone held as a bond-servant for life; a human being wholly the property of another; one who surrenders himself wholly to any power, as to an appetite, or to the influence of another; a drudge; v. to drudge; to toil unremittingly."

The Permanent Edition of Words and Phrases, vol. 39, gives the following definition of "slavery":

"A state of entire subjection of one person to the will of another * * * a condition of enforced compulsory service of one to another."

The term "slave" received judicial construction in the unreported District Court case tried in 1907 in the Southern District of New York, United States v. Sabbia.[1] There the Court stated:

"I prefer to consider the act as framed Section 443 of Title 18, U.S.C.A. for post-bellum conditions, in the light of the war amendments, and as using the word slave as meaning a person in a state of enforced or extorted servitude to another."

The question was also presented in United States v. Peacher[1], decided in the United States District Court for the Eastern District of Arkansas in 1937. Although unreported, an examination of the records of that case discloses that it was the Government's contention that "slave," as used in Section 443, meant one held in a state of involuntary servitude in the post-civil war sense, and that an indictment which disclosed that contention was held good as against demurrer.

In Hodges v. United States, 203 U.S. 1, at page 16, 27 S.Ct. 6, at page 8, 51 L.Ed. 65, decided in 1905, the Supreme Court defined slavery as "a condition of enforced compulsory service of one to another."

On page 17 of the same opinion in 203 U.S., 27 S.Ct. 8, 51 L.Ed. 65, we find the following:

"A reference to the definitions in the dictionaries of words whose meaning is so thoroughly understood by all seems an af-

fectation, yet in Webster 'slavery' is defined as 'the state of entire subjection of one person to the will of another.' Even the secondary meaning given recognizes the fact of subjection, as 'one who has lost the power of resistance; one who surrenders himself to any power whatever; as a slave to passion, to lust, to strong drink, to ambition,' and 'servitude' is by the same authority declared to be 'the state of voluntary or compulsory subjection to a master.' "

The Court arrived at its definition which was embodied in the instruction on slavery after a consideration of the authorities hereinbefore mentioned.

The evidence was sufficient to warrant the jury in finding that the defendant Elizabeth Ingalls did entice, persuade and induce Dora L. Jones to go from Berkeley, Alameda County, California, to Coronado, San Diego County, California, with the intent that Dora L. Jones be held as a slave, as charged in Count One of the indictment.

The motion for new trial is denied.

---

[1] No opinion for publication.