UNITED STATES of America, Appellee,

v.

Tony BOOKER, Appellant.

UNITED STATES of America, Appellee,

v.

J. D. ROLLINS, Appellant.

Nos. 80–5164, 80–5165.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1981.

Decided July 30, 1981.

intent to hold them as slaves in violation of 18 U.S.C. §§ 1583 and 2 (1976). Booker and Rollins appeal, questioning the legal sufficiency of the evidence to convict them under the statute and the legal correctness of the district court's instruction to the jury of what it means to be "held as a slave" under § 1583. We see no merit in the appeals and affirm.

I.

Booker operated a migrant agricultural labor camp in Johnston County, North Carolina. Two of his lieutenants, Rollins and Gibson, brought Gary Walters, his half-brother and Joseph Romeo to the camp from Florida, having promised them free transportation and steady work. The men discovered instead that employment was intermittent, that they would be charged both for their meals while idle and for their transportation from Florida, that Booker withheld their wages and required all retail purchases to be executed at the camp, and that they were forbidden to leave the camp until they had satisfied any debts allegedly owed Booker. Booker repeatedly threatened workers at the camp with serious injury or death if they attempted to leave without paying their debts, and he backed up his threats with severe beatings and assaults with firearms, administered personally or by his lieutenants.

The indictment was returned as the result of an incident at the camp involving Walters and Romeo. Walters asked Booker for permission to leave the camp to buy some personal items and for a small advance on his wages. Booker refused, and left the camp, leaving instructions to his lieutenants to "keep an eye on things" and not to permit any workers to depart in his absence. Walters and Romeo set out nonetheless for a nearby store, whereupon Rollins, Gibson and a third unidentified individual threatened them, beat them severely, forced them into the van and returned them

---

Joseph T. Nall, Smithfield, N. C., John H. Boddie, Raleigh, N. C., for appellants.

Louise A. Lerner, Dept. of Justice (Walter W. Barnett, Dept. of Justice, James P. Turner, Acting Asst. Atty. Gen., Washington, D. C., on brief), for appellee.

Before WINTER and WIDENER, Circuit Judges, and MICHAEL,* District Judge.

WINTER, Circuit Judge:

Tony Booker, J. D. Rollins and Tony Gibson were convicted by a jury of kidnapping and carrying away two persons with the

* Honorable James H. Michael, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

to the camp. Walters was knocked down by a blow to the jaw, choked until he entered the van, and then struck again to his knees upon his return to camp, breaking his nose and bloodying his face. Romeo was beaten severely with an ax handle. Booker, who had returned to camp by the time Walters and Romeo had been brought back, warned them that they could expect more physical abuse or death if they ever tried to leave camp again while owing him money, punctuating this discussion with foul and abusive language. Walters and Romeo both testified that they thought that Booker meant to carry out his threats. They left the camp shortly thereafter when representatives of Farm Workers' Legal Services arrived, and they refused medical attention because of their anxiety to leave North Carolina and get away from Booker and his men.

## II.

We hold that this evidence provided a substantial basis on which the jury could conclude beyond a reasonable doubt that Rollins and Gibson, at the instigation of Booker, kidnapped and carried away Walters and Romeo from the road, returning them to the camp with the intent to hold them as slaves in violation of 18 U.S.C. §§ 1583 and 2.[1] We reach this conclusion from our understanding of the intent and scope of § 1583. Section 1583, along with sections 1581 and 1584 of Title 18, was enacted to enforce the thirteenth amendment to the Constitution, which provides in part that "Neither slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." The amendment and the legislation were intended to eradicate not merely the formal system of slavery that had existed in the southern states prior to the Civil War, but all forms of compulsory, involuntary service. *See Clyatt v. United States,* 197 U.S. 207, 215–19, 25 S.Ct. 429, 430–431, 49 L.Ed. 726 (1905); *The Peonage Cases,*

123 F. 671, 675–83 (M.D.Ala.1903); *see also The Civil Rights Cases,* 109 U.S. 3, 20–23, 3 S.Ct. 18, 27–30, 27 L.Ed. 835 (1883); *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 89–90, 21 L.Ed. 394 (1873) (Field, J., dissenting).

Significantly, the thirteenth amendment applied not only to state-sanctioned slavery but to slavery practiced by individuals. As the Supreme Court stated in the *Civil Rights Cases*:

> By its own unaided force and effect it abolished slavery, and established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.

109 U.S. at 20, 3 S.Ct. at 28.

Congress in fact moved swiftly to provide such legislation after the amendment was ratified in December 1865. The South was far from wholly reconciled to the abandonment of the system of forced labor that contributed significantly to the economic success of its agriculture. *See* R. Fogel and S. Engerman, Time on the Cross (1974). Many planters felt strongly that they simply could not work their fields without compulsory service. *A Georgia Leader on Reconstruction* and *Conversation of Alabama Planters* in R.N. Current, ed., Reconstruction [1865–1877], at 39, 46 (1969). Moreover, the war-torn South had large numbers of homeless uprooted people who today would probably be characterized as refugees but were then commonly seen as roaming, "dangerous" vagrants. Some local authorities responded by permitting employers to engage laborers on a basis that essen-

---

1. Section 1583 provides in pertinent part:
   Whoever kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude, or

held as a slave; . . . Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

tially bound the worker for life. C. V. Woodward, The Strange Career of Jim Crow 23 (3d Rev.Ed.1974). Many states enacted so-called "Black Codes" that severely restricted the freedom of the former slaves and provided tough criminal sanctions for those who violated their "labor contracts" with employers. J. H. Franklin, Reconstruction After the Civil War 48–50 (1961); J. L. Roark, Masters Without Slaves 139–40 (1977). The Freedmen's Bureau and the federal military authorities acted quickly to eliminate the more obnoxious features of these schemes, but the dominant Radical faction in Congress became convinced that the openly-expressed Southern attitudes confirmed by the quick enactment of the Black Codes presaged the recrudescence of slavery. J. H. Franklin, *supra*, at 55–57. In 1866, Congress sought to extend the life of the Freedmen's Bureau, enacted the Civil Rights Bill of 1866, and on May 28, acted to proscribe kidnapping for the purpose of selling persons into involuntary servitude or holding them as slaves. 14 Stat. 50, 39th Cong., 1st Sess. (1866).

The legislative history for this provision, now codified as 18 U.S.C. § 1583, is very limited. Senator Charles Sumner of Massachusetts, one of the leaders of the Radicals, introduced the bill as a measure to prevent the kidnapping and sale of former slaves to countries which still permitted slavery, such as Cuba and Brazil. Cong.Globe, 39th Cong., 1st Sess. 852 (1866); *see* J. L. Roark, *supra*. Notwithstanding this limited purpose, the statute should be read as express-ing the broad and sweeping intention of Congress during the Reconstruction period to stamp out the vestiges of the old regime of slavery and to prevent the reappearance of forced labor in whatever new form it might take.[2]

The few reported cases that discuss this statute and the related provisions of 18 U.S.C. §§ 1581 and 1584 have confirmed this view. In *Bailey v. Alabama*, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911), the Supreme Court held invalid an Alabama statute that prescribed criminal penalties for laborers who breached their employment contracts without satisfying debts owed their employer. The statute established a presumption of criminal intent to defraud the employer by the fact of the mere breach of the contract. The Court ruled that the statute effectively required compulsory service impermissible under the thirteenth amendment because the compulsion inherent in the threat of criminal sanctions was as strong as that inherent in the use of physical force. 219 U.S. at 240–45, 31 S.Ct. at 151–153. In *United States v. McClellan*, 127 F. 971 (S.D.Ga.1904), the district court refused to quash an indictment that charged several defendants with the sale of a man into forced labor, holding that the statutes (now §§ 1581, 1583 and 1584) broadly regulated behavior of this type and were neither unconstitutional nor were to be confined to the narrow circumstances of the particular evils which they were intended to redress.[3] *See also The Peonage Cases*, 123 F. 671.

---

**2.** For example, in 1867 Congress acted to outlaw the system of peonage in the Territory of New Mexico that had existed since the Spanish colonial era. 14 Stat. 546, 39th Cong., 2d Sess. (1867). This statute is the predecessor of 18 U.S.C. §§ 1581 and 1584. As the Supreme Court in the *Slaughter-House Cases* pointed out:

> Undoubtedly while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereafter. If Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, this amendment may safely be trusted to make it void.

83 U.S. (16 Wall.) at 72. The thirty-ninth Congress and its successors in the Reconstruction era were clearly determined to ensure that the amendment had just such a comprehensive effect.

**3.** As noted above, the prohibitions against peonage and involuntary servitude now codified as 18 U.S.C. §§ 1581 and 1584 originally stemmed from the congressional effort to eliminate the formal system of peonage in the Territory of New Mexico. Judge Friendly's discussion of these statutes in his opinion for the court in *United States v. Shackney*, 333 F.2d 475, 481–85 (2 Cir. 1964), demonstrates that both the legislative history and the subsequent judicial construction of these statutes confirm their broad applicability to conditions where

■ We accordingly think that the sort of migrant labor camp operated by Booker with the assistance of the other defendants in this case clearly comes within the purview of these statutes. The thirteenth amendment and the laws that enforce it were directed not only at involuntary servitude supported by state action but that exacted by purely private conduct as well. They established the fundamental principle that no person could secure the labor of another by compulsion. The statutes protected persons similarly situated to the migrant workers of our own time. They were persons without property and without skills save those in tending the fields. With little education, little money and little hope, they easily fell prey to the tempting offers of "powerful and unscrupulous" individuals, *United States v. McClellan*, 127 F. at 979, who would soon assert complete control over their lives. That control might be maintained through the threat of criminal sanctions, as in *Bailey v. Alabama* and *United States v. Ingalls*, 73 F.Supp. 76 (S.D. Cal.1947), or through physical force as practiced here and in *United States v. Bibbs*, 564 F.2d 1165 (5 Cir. 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). It is disturbing that such involuntary servitude was assisted by the silent and even collaborative acquiescence of local communities. *McClellan*, 127 F. at 972–73. It is for this reason that Congress extended federal jurisdiction to encompass these crimes despite the availability of state remedies for kidnapping and false imprisonment. In short the statute must be read not only to render criminal the evil Congress sought to eradicate so long ago but, as well, its Twentieth Century counterpart.

labor is exacted by compulsion. It also demonstrates that subsequent congressional enactments were intended to address interstitial problems in the specific enforcement of prior statutes. The predecessor of § 1583 was inadequate not because of its limited original purpose but because it only punished the kidnapper and his aiders and abettors and did not necessarily reach the person who exacted the servitude. 333 F.2d at 482.

4. Booker also claims that the government failed to establish his liability as an aider and abettor under 18 U.S.C. § 2, arguing that he did not personally participate in the beating and kid-

## III.

■ The defendants conceded at oral argument that their behavior was not exemplary, but they contend on this appeal that the government failed to establish its case against them under § 1583.[4] First they submit that the government did not present sufficient evidence to prove the requisite intent to hold Walters and Romeo as slaves. The generally accepted definition of "slavery" under § 1583 is the formulation of the district court in *United States v. Ingalls*, 73 F.Supp. 76 (S.D.Cal.1947):

A slave is a person who is wholly subject to the will of another, one who has no freedom of action and whose person and services are wholly under the control of another, and who is in a state of compulsory service to another.

73 F.Supp. at 78. The defendants argue that Walters and Romeo were not wholly under Booker's control because he did not maintain "superior and overpowering force, constantly present and threatening," relying on *United States v. Shackney*, 333 F.2d 475, 486 (2 Cir. 1964). That reliance is mistaken. First, as a factual matter, the record in this case readily establishes the climate of fear pervading Booker's camp created by the beatings and assaults on the workers and threats of like treatment. Second, a proper reading of *Shackney* leads us to conclude that it supports defendants' convictions. *Shackney* was a prosecution for holding persons in peonage in violation of §§ 1581 and 1584. Although the court did state that no involuntary servitude existed "where the servant knows he has a

napping of Walters and Romeo. We think this claim is meritless. He did "counsel, command, induce [and] procure" the commission of this crime by his lieutenants within the meaning of § 2 even if he arguably did not "aid and abet" it. Booker's threats, his supervision of Rollins and Gibson and his pointed warnings to Walters and Romeo after their beating at the camp clearly establish his involvement sufficiently to sustain this conviction. Under these circumstances, he need not have been present at the scene of the abduction. *See, e. g., Aaronson v. United States*, 175 F.2d 41, 43–44 (4 Cir. 1949).

choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad," 333 F.2d at 486, it also stated that "it would be grotesque to read 'involuntary servitude' as not covering a situation where an employee was physically restrained by guards," and that "[v]arious combinations of physical violence, of indications that more would be used on any attempt to escape, and of threats to cause immediate legal confinement, whether for the escape or some other reason, have also been held sufficient." *Id.* The distinction drawn in *Shackney* is between the service compelled by just the sort of violence and threats of violence prevalent in this case, which infringe the statute, and the lesser threat of deportation to Mexico, the native country of the workers in *Shackney*, which the court found "close to the line" and "highly reprehensible" but insufficient to sustain a felony prosecution. 333 F.2d at 486–87.

■ Indeed in *Ingalls*, cited with approval by the *Shackney* court, the compelling force sufficient to hold the victim as a slave was the threat to bring a morals charge against the victim for conduct that occurred some thirty-eight years previously. Finally, the beatings of workers for attempting to escape without paying alleged debts here closely resemble those found sufficient to uphold convictions of defendants accused of holding migrant farm workers to involuntary servitude in *United States v. Bibbs*, 564 F.2d 1165, 1167–68 (5 Cir. 1977), *cert. denied*, 437 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). We think the evidence of enforced compulsory service in this case established the intent of the defendants to hold Walters and Romeo as slaves.

■ The evidence similarly established that the defendants kidnapped and carried away the victims. Walters and Romeo were forced against their will to enter a van by Rollins and Gibson and to return to the camp, where they were held by the threat of force until they were rescued by the representatives of Farm Workers' Legal Services. The distance the victims were transported is not material for a prosecution for kidnapping. *See, e. g., State v. Barbour*, 278 N.C. 449, 180 S.E.2d 115, 118 (1971). Neither does the federal statute at issue here require transportation of the victims across a state line, because it derives its authority from the thirteenth amendment, which prohibits slavery and practices incident to it to secure liberty throughout the country. The very purpose of § 1583 was to extend constitutional protection against kidnapping for the purpose of exacting involuntary servitude into every state where such protection was previously not available. *See United States v. Wheeler*, 254 F. 611, 616 (D.Ariz.1918), *aff'd*, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270 (1920); *Clyatt v. United States*, 197 U.S. at 216–17, 25 S.Ct. at 430–431.

IV.

■ The defendants also argue that the district court's charge to the jury concerning the meaning of holding persons as slaves under § 1583 was deficient. The instruction given was virtually identical to that used in *Ingalls*, which the defendants concede correctly states the applicable law. The district court's additional comment on the definition, read in context, did not introduce an alternative to the definition. It merely made the definition more understandable. The district court need not and should not have charged the jury that it would have to find that the defendants' use of force effectively denied the possibility of escape to the victims. The availability of escape, as the history of slavery has shown, or even a situation where the discipline of terror is not constantly enforced, does not preclude a finding that persons are held as slaves. *United States v. Bibbs*, 564 F.2d at 1168. The threat of violence or confinement, backed sufficiently by deeds as in this case, suffices to subjugate human beings to the will of another in violation of the thirteenth amendment and § 1583. We conclude the conditions of the migrant labor camp operated by Booker in this case fall well within the ambit of slavery prohibited by the Constitution and contemplated by this statute.

AFFIRMED.

**568**

WIDENER, Circuit Judge, concurring:

I concur in the result.